IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 24, 2002

**STATE OF TENNESSEE v. ALLEN PRENTICE BLYE**

**Appeal from the Criminal Court for Sullivan County**
**Nos. S42, 293      R. Jerry Beck, Judge**

---

**No. E2001-01227-CCA-R3-CD**
**September 19, 2002**

---

The Defendant, Allen Prentice Blye, was convicted by a jury of aggravated burglary and aggravated rape. The trial court sentenced the Defendant as a Range III, persistent offender to fifteen years for the aggravated burglary, and as a Range II, violent offender to forty years for the aggravated rape. The sentences were ordered to be served consecutively in the Department of Correction, for an effective sentence of fifty-five years. The Defendant now appeals as of right, alleging that the trial court erred in refusing to suppress evidence; erred in admitting certain testimony at trial concerning DNA evidence; that the evidence is not sufficient to support his convictions; that the trial court erred in refusing to grant him the services of a psychological expert for sentencing purposes; and that the trial court erred in its application of enhancement and mitigating factors in setting the length of his sentences. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH, J., joined. JOE G. RILEY, J., filed a concurring opinion.

Julie A. Rice, Knoxville, Tennessee and Terry Jordan, Assistant Public Defender, Blountville, Tennessee, for the appellant, Allen Prentice Blye.

Paul G. Summers, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General;Greeley Wells, District Attorney General; and Joseph E. Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The victim in this case, R.C.,[1] testified that she was awakened from her sleep on the night of June 19, 1998, when she felt someone in bed with her. The person put his hands around her neck,

---

[1] We will identify the victim of the aggravated rape by her initials.

and R.C. noticed that he was wearing loose-fitting gloves. She asked the intruder, "[w]ho are you and what are you doing in my house?" The intruder's only response was to start choking R.C.

R.C. began fighting, and the choking increased. The two fell off of the bed and onto the floor, with R.C. on her stomach and the man on her back. The choking stopped and the victim pleaded with her attacker to leave. She reached back for his head, but it was covered with some kind of soft material. The man reached down and removed her panties, pulled his pants down, and raped her. Afterwards, he wrapped her in a comforter, put a pillowcase over her head, and dragged her into the bathroom. There, he ran hot water into the sink and tried to force R.C. to sit in the sink. When she struggled, he put her on the floor and rinsed her genital area with water from the sink. He then left the bathroom and R.C. escaped through the bathroom window.

R.C. ran to a neighbor's house, wearing only the tee-shirt she had been sleeping in, and called the police. After the police arrived, Officer David Samples accompanied R.C. back to her house. They entered through the side door, which was open. Inside, they found a pair of nylon jogging pants in the kitchen sink with water running over them. These pants were subsequently determined to have gasoline and kerosene on them. Officer Samples also noticed a bedroom lamp and table knocked over, bedding on the floor, and water running in the bathroom sink. R.C. also found many of her photographs in disarray, and later discovered that a sweater vest and a dress were missing; she testified that the covering over her attacker's head felt like her sweater vest.

R.C. went to the hospital, where a rape kit was performed, including vaginal swabs. Dr. Keith Byrd, the treating physician, testified that the victim had bruises on her neck, a large hematoma on her left buttock, and abrasions on her left flank. The police collected the tee-shirt and panties R.C. had been wearing during the attack. R.C. was unable to identify her attacker or describe him, but she estimated that he was five feet, ten inches to six feet tall. She also smelled the odor of gasoline or kerosene about him.

Detective David Joe Cole of the Kingsport Police Department testified that he spoke with the Defendant on July 12, 1998. The Defendant informed Det. Cole that he was in the lawn care business. Det. Cole testified that the Defendant is five feet, ten inches tall. Det. Cole also testified that, in February 2000, he met with Deborah McDowell at the Tennessee Women's Prison, where she turned over to him a letter and envelope. The envelope had the Defendant's address on it, with which Det. Cole was familiar. Det. Cole also recognized the Defendant's signature on the bottom of the letter contained in the envelope. Det. Cole turned the envelope over to the TBI laboratory. Det. Cole testified that he was present when blood was subsequently drawn from the Defendant, which was also turned over to the TBI lab.

Officer Timothy Horne testified that he came into contact with the Defendant on August 9, 1998, and noticed the smell of gasoline about the Defendant.

Dr. Michael Alexander Turbeville testified as an expert witness in serology and DNA. As a forensic scientist with the TBI lab, Dr. Turbeville examined and analyzed the rape kit and tee-shirt

recovered from the victim, as well as the envelope recovered from Ms. McDowell and the blood drawn from the Defendant. Dr. Turbeville testified that he found sperm present in the vaginal swabs taken from R.C. and on the tee-shirt she had been wearing during the attack, and was able to obtain a DNA profile from these deposits. He was also able to obtain a DNA profile from saliva recovered from the envelope. All of these DNA profiles were consistent with one another, and all of them matched the DNA profile obtained from the Defendant's blood. Dr. Turbeville testified that the chance of the Defendant's blood being a random match to the other samples was one in a number greater than the population of the earth.

## SUPPRESSION OF EVIDENCE

We first address the Defendant's contentions regarding the search warrant which resulted in his blood being drawn.

In July 1999, after commencement of the instant prosecution, the State filed a motion requesting the trial court to enter an order directing the Defendant to submit to the drawing of a sample of his blood for purposes of DNA comparison. After an evidentiary hearing, the trial court denied the State's motion on the basis that the State had failed to establish probable cause for the issuance of the warrant. In June 2000, Det. Cole filed an affidavit in support of a search warrant with Judge Lynn Brown of the First Judicial District, which District included Johnson County where the Defendant was incarcerated, but not the county in which this case was prosecuted. The affidavit provides, in pertinent part, that

> [a]s part of this investigation, it was learned that the defendant had contacted a friend, Deborah McDowell, and had corresponded with her, by letters, with the purpose of having her contact the victim for him. On February 28, 2000, I [Det. David Joe Cole] went to the Tennessee Prison [f]or Women, in Nashville and interviewed Ms. McDowell. During this interview, she advised that she still had a letter and envelope sent to her by the defendant. She voluntarily released these items to me, and I took them to the TBI Lab. I submitted the envelope for analysis, and saliva was found. DNA, isolated and analyzed from the saliva, was compared to the DNA profile of the seminal fluid [recovered from the victim]. The results of this test revealed that the saliva, from the envelope, had the same profile as the seminal fluid, recovered from the scene of the rape. The odds of it being someone unrelated would be beyond the known population of the world.

> This letter was sent to Ms. McDowell, and contained the return address belonging to [the Defendant], and the handwriting was confirmed by Ms. McDowell as belonging to [the Defendant]. Your affiant is presently aware of [the Defendant's] address and of his handwriting, both matching what is displayed on the envelope. Your affiant has probable cause to believe that [the Defendant] sent this

-3-

letter to Ms. McDowell, and that the saliva recovered from the envelope is his. Your affiant also has probable cause to believe that the blood of [the Defendant] will be matched by DNA, to the seminal fluid left by the rapist.

Based on the affidavit, Judge Brown issued the search warrant, which provided for the drawing of three tubes of blood from the Defendant. Following issuance of the warrant, Det. Cole, an officer of Sullivan County, went to the Northeast State Correctional Facility in Johnson County and, accompanied by one or more of the correctional officers, met with the Defendant in the prison infirmary. Although Det. Cole showed the search warrant to the Defendant, the Defendant refused to allow his blood to be drawn. Det. Cole returned to Judge Brown, explaining that the Defendant refused to submit to the search warrant. Judge Brown then issued an order providing that "[t]he Warden shall have [the Defendant] transported to the Johnson Co[unty] Health Center with sufficient personnel to take blood samples from [the Defendant] by whatever means may be necessary or by any necessary restraint." Det. Cole returned to the Northeast State Correctional Facility and showed this order to the Defendant, who was in the infirmary with correctional officers and the facility warden, Howard Carlton. The Defendant then requested and obtained a statement signed by Warden Carlton, which provides that "Inmate Allan P. Blye #131085 is giving blood per court order due to the fact that the Warden told him he must or it would be taken by force if he did not comply. He is giving the blood under duress." The Defendant then submitted to his blood being drawn in the prison infirmary.

In September 2000, the Defendant filed a motion to suppress the blood drawn from him pursuant to the search warrant issued by Judge Brown. After a hearing, the Defendant's motion was denied. The Defendant now contends that the denial of his motion to suppress was error.

In support of his contention, the Defendant alleges that the affidavit in support of the search warrant is constitutionally infirm because it fails to establish the veracity of Ms. McDowell. We begin our analysis of this argument with the familiar "black-letter law" regarding search warrants:

> As a general rule, a search warrant shall be issued only on the basis of an affidavit, sworn before a "neutral and detached" magistrate, which establishes probable cause for its issuance. A showing of probable cause requires, generally, reasonable grounds for suspicion, supported by circumstances indicative of an illegal act. Thus, the need for the magistrate to make a neutral and detached decision regarding the existence of probable cause requires that the affidavit contain more than mere conclusory allegations by the affiant.
>
> In determining the reliability of information contained in an affidavit in support of a search warrant, there is a significant distinction between a "citizen informant," or bystander witnesses, and "criminal informants," or those from a 'criminal milieu.' Information provided by a citizen or bystander witness that is known to the affiant

is presumed to be reliable; and the state is not required to establish either the credibility of the informant or the reliability of the information. Although the name of the citizen informant does not have to be disclosed, "the reliability of the source and the information must be judged from all of the circumstances and from the entirety of the affidavit."

Conversely, if the source is a criminal informant, the determination of reliability must be based on the two-pronged Aguilar-Spinelli test . . . . The magistrate issuing the search warrant must be "informed of both (1) the basis for the informant's knowledge, and either (2)(a) a basis establishing the informant's credibility or (2)(b) a basis establishing that the informant's information is reliable." Probable cause may not be found until both prongs are independently considered and satisfied.

State v. Stevens, 989 S.W.2d 290, 293-94 (Tenn. 1999) (citations and footnote omitted). The reason for requiring additional indicia of reliability for criminal informants is because

[i]nformation supplied to officers by the traditional police informer is not given in the spirit of a concerned citizen, but often is given in exchange for some concession, payment, or simply out of revenge against the subject. The nature of these persons and the information which they supply convey a certain impression of unreliability, and it is proper to demand that some evidence of their credibility and reliability be shown . . . .

Id. at 294 (quoting State v. Smith, 867 S.W.2d 343, 347 (Tenn. Crim. App. 1993)).

The Defendant argues that Ms. McDowell is part of the "criminal milieu" and that the reliability of the information she provided to Det. Cole must therefore satisfy the Aguilar-Spinelli test. The State disagrees, arguing that Ms. McDowell should be categorized as a citizen informant. We find, however, that the type of information provided by Ms. McDowell makes it unnecessary to classify her as either type of informant, and further makes it unnecessary to apply the Aguilar-Spinelli test.

In State v. Cauley, 863 S.W.2d 411, 417-18 (Tenn. 1993), our supreme court recognized that non-accusatory information that does not describe criminal activity is not in the nature of a criminal informant's tip. In this case, Ms. McDowell informed Det. Cole of two things, according to the affidavit: that she had a letter and envelope sent to her by the Defendant; and that the correspondence contained the Defendant's handwriting. This information is not accusatory, nor does it describe criminal activity. Ms. McDowell was acting not as a criminal informant, but as a curator of personal property believed to have previously been in the Defendant's possession.

However, even if we were to find that Ms. McDowell was from the "criminal milieu," we find that the affidavit passes the two-prong Aguilar-Spinelli test. With respect to the first prong, that the affidavit informs the reviewing magistrate of the basis for the informant's knowledge, the affidavit asserts that Det. Cole learned during the course of the investigation that Ms. McDowell had received correspondence from the Defendant. Ms. McDowell confirmed this by turning over to Det. Cole a letter and envelope she had received purporting to be from the Defendant. Thus, the basis for Ms. McDowell's knowledge of receiving correspondence from the Defendant was confirmed by an actual piece of such correspondence. With respect to the second prong, that the affidavit sets forth a basis establishing the informant's credibility or a basis establishing that the informant's information is reliable, the affidavit provides that Det. Cole is himself familiar with the Defendant's handwriting and that the handwriting on the envelope given to him by Ms. McDowell matches it. Det. Cole's recognition of the Defendant's handwriting on the envelope establishes that Ms. McDowell's report of receiving correspondence from the Defendant is reliable. Accordingly, the affidavit satisfies the Aguilar-Spinelli test, and this issue is therefore without merit.

The Defendant also contends that the blood samples drawn as a result of the search warrant constitute "fruit of the poisonous tree," and the test results should therefore have been suppressed. See generally Wong Sun v. United States, 371 U.S. 471, 485-86, 83 S.Ct. 407, 416 (1963). The Defendant points to the fact that the State had filed a second motion with the trial court for the issuance of a search warrant for the Defendant's blood, but before the motion was docketed, Det. Cole went to a different judge in a different county and obtained the warrant without notice to the Defendant or his lawyer. Accordingly, the Defendant argues, the search is tainted by improper police conduct. The Defendant urges that "once a defendant is represented by counsel and certain procedures have been put in motion in the trial court, the only appropriate and constitutionally firm course of action [is] to require notice and a hearing before non-testimonial evidence may be seized from a defendant under the auspices of a search warrant." The Defendant acknowledges that he has no case law upon which to rely in making this argument.

We are unpersuaded that the State's action in obtaining the search warrant from a judge in the county in which the Defendant was imprisoned, rather than the trial judge before whom the prosecution was proceeding, tainted the search so as to render the blood tests inadmissible. Tennessee Rule of Criminal Procedure 41(a) provides that "[a] search warrant authorized by this rule may be issued by a magistrate with jurisdiction within the county wherein the property sought is located . . . ." Here, the property sought was the Defendant's blood: the Defendant was located in Johnson County. Det. Cole sought and obtained the search warrant from one of the judges with jurisdiction in that county; the trial judge in this proceeding did not have jurisdiction in that county.[2]

Alternatively, a search warrant may be issued "upon request of the district attorney general or assistant or criminal investigator . . . ." Id. That is, "the officers could have enlisted the assistance of the District Attorney General's Office, filed a motion in the trial court seeking the entry of an order permitting the officers to obtain the samples, and both parties could have litigated the issues

---

[2]We note, however, that the trial court had personal jurisdiction over the Defendant himself.

at an adversarial evidentiary hearing." State v. Baker, 956 S.W.2d 8, 13 (Tenn. Crim. App. 1997). Indeed, that was the procedure followed earlier in this case. However, the State's previous decision to seek a search warrant by one method does not preclude it from seeking the same warrant by the other method.

The State's initial motion in the trial court to obtain blood samples from the Defendant was denied because the information on which the blood samples were sought was insufficient to establish probable cause. However, at that time the State did not possess the test results which were obtained from the saliva on the envelope bearing the Defendant's handwriting and address. Once that information was obtained, a new attempt to obtain a search warrant was appropriate. That the State sought the warrant in a different county is immaterial: the standards for the issuance of search warrants do not differ among Tennessee's various counties. Moreover, the Defendant obviously had an opportunity to attempt to suppress the results of the search, and he did so. We see no likelihood that the result of a challenge to the warrant would have been different had suppression been sought prior to the blood being drawn rather than after. That is, we are not convinced that the Defendant was in any way prejudiced by the process followed by the State in seeking and obtaining the search warrant.

Moreover, we disagree that the Defendant was entitled to notice and a hearing before the search warrant was issued. This Court has previously held that a criminal defendant is "not entitled to an adversarial determination of probable cause for the issuance of [a] search warrant." Id. Accordingly, we find this issue to be without merit.

Finally, the Defendant contends that the search warrant should be found invalid, and the evidence accruing therefrom deemed inadmissible, because the issuing magistrate did not transmit the original executed warrant to the Sullivan County clerk, the county in which the prosecution was pending. The Defendant's argument stems from Tennessee's Rule of Criminal Procedure 41(d) which provides that the executed original warrant shall be transmitted by the issuing magistrate "to the clerk of the court having jurisdiction of the alleged offense in respect to which the search warrant was issued." The Defendant cites no case law in support of his argument, and acknowledges that our supreme court has held that returns of warrants are ministerial in nature, and that an irregularity in making the return does not invalidate the search. See State v. Calvert, 410 S.W.2d 907, 913 (Tenn. 1966). While Calvert and its progeny deal with the returns of warrants rather than their transmission to the clerk of the court having jurisdiction over the alleged offense, we find that the magistrate's duty of transmission is similarly ministerial in nature, and that the irregularity complained of here should not require suppression of the evidence obtained pursuant to the search warrant. This issue is, accordingly, without merit.

### ADMISSION OF EXPERT TESTIMONY

We next address the Defendant's arguments concerning the admission of Dr. Turbeville's testimony as an expert witness. Prior to trial, defense counsel objected to Dr. Turbeville's anticipated testimony about the probability of a random match to the DNA sample obtained from the sperm recovered from the victim's tee-shirt and vaginal area. The ground for the objection was that

Dr. Turbeville had insufficient expertise in population genetics and/or population statistics. During the hearing on the Defendant's motion in limine, Dr. Turbeville testified that he has an undergraduate degree in biology and a doctorate in pathobiology. He testified that, in conjunction with obtaining these degrees, he took coursework in population genetics and population statistics. He admitted, however, that he was not an expert in those areas. Rather, he is a forensic serologist DNA analyst.

Dr. Turbeville testified that, after obtaining a DNA profile, he develops a "statistical analysis to say how rare or how common that profile is in the general population." Dr. Turbeville testified that the statistical analysis is formulated from a database compiled by Perkin-Elmer, with the assistance of a computer software program developed by the FBI. Using the database, the software program "shows . . . how probable this particular DNA profile is at random in the general population." Dr. Turbeville also testified that this system was relied upon throughout the country.

The trial court denied the Defendant's motion, finding that the Perkin-Elmer database, as interpreted by the FBI software program, was appropriate data upon which Dr. Turbeville could rely in forming his opinion. In making its ruling, the trial court relied on Tennessee Rule of Evidence 703, which provides that

> [t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

We will not overturn a trial court's decision regarding the admissibility, qualifications, relevancy and competency of expert testimony absent an abuse of discretion. See State v. Begley, 956 S.W.2d 471, 475 (Tenn. 1997).

While we agree with the trial court that Dr. Turbeville's testimony was admissible, reliance upon Rule of Evidence 703 was unnecessary because our legislature has determined that, "[i]n any civil or criminal trial, hearing or proceeding, statistical population frequency evidence, based on genetic or blood test results, is admissible in evidence to demonstrate the fraction of the population that would have the same combination of genetic markers as was found in a specific biological specimen. . . ." Tenn. Code Ann. § 24-7-118(c). Moreover, this Court has previously considered the Defendant's argument and rejected it. See State v. Spratt, 31 S.W.3d 587, 601-604 (Tenn. Crim. App. 2000) (affirming trial court's admission of TBI forensic scientist's testimony about performing a DNA analysis and the statistical probabilities associated with a particular sample over the

defendant's objection that the witness was not qualified to testify about the statistical probabilities). Accordingly, we find this issue to be without merit.[3]

## SUFFICIENCY

We next address the Defendant's contention that the evidence is not sufficient to support his convictions. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

The Defendant was convicted of aggravated burglary and aggravated rape. Aggravated burglary is committed when a person enters a habitation without the owner's consent and commits or attempts to commit a felony, theft or assault. See Tenn. Code Ann. §§ 39-14-403(a), 39-14-402(a)(3). Aggravated rape is the unlawful sexual penetration of a victim by the defendant and the defendant causes bodily injury to the victim. See id. § 39-13-502(a)(2). The Defendant does not challenge the proof in support of any of these specific elements; rather, he contends that the evidence is not sufficient to prove that he was the person who committed these offenses against the victim.

---

[3]The Defendant has cited us to no case law in support of the proposition that the forensic scientist who performs the DNA analysis must also be an expert in population genetics and/or population statistics in order to testify about the probability of a random match to the DNA profile which is the subject of the expert's testimony. We note, however, that if a defendant wishes to challenge the validity of the underlying database upon which the statistical probability is based, he or she may, of course, put on expert testimony of his or her own. See Tenn. Code Ann. § 24-7-118(b)(2); Spratt, 31 S.W.3d at 604. Indeed, in this case, the Defendant requested and was granted funds with which to obtain an expert in the field of DNA testing.

We respectfully disagree. The evidence included sperm recovered from the victim's vagina and from the tee-shirt she was wearing during the attack. The DNA profile from the sperm matched the DNA profile obtained from a sample of the Defendant's blood. Dr. Turbeville testified that the chances of the match being random was one in 600,010 trillion. This was sufficient evidence from which the jury could legitimately conclude that the Defendant was the victim's assailant. This issue is, accordingly, without merit.

**SENTENCING**

We turn now to the Defendant's claim that the trial court erred "in refusing to grant [him] the services of a psychological expert for sentencing purposes." A review of the chronology of the Defendant's alleged attempts to obtain such an expert will be helpful. The jury returned its verdict finding the Defendant guilty on January 19, 2001. On that same date, the trial court set the sentencing hearing for February 12, 2001. At the beginning of that hearing on February 12, 2001, defense counsel requested a continuance for "time to have [the Defendant] examined by the prison psychologist." The examination, according to defense counsel, "would only go to -- to possible mitigating factors." Defense counsel referred to a 1993 document entitled "Mental Health Evaluation" as indicating that the Defendant "may have been acting under some sort of physical or mental debility that -- that would somehow mitigate [the Defendant's sentences] because of his psychological problems." The trial court denied the Defendant's request for a continuance; however, prior to the State calling any witnesses, the sentencing hearing was continued until March 16, 2001, on other grounds.

On March 16, 2001, the Defendant's sentencing hearing recommenced. The record before us contains no motions filed prior to this time requesting a psychological evaluation. At the close of the State's proof, however, defense counsel stated, "we would like to file a formal written motion for an expert in the field of brain injuries," and again requested a continuance. The record does not contain a copy of the "formal written motion," but does contain copies of the documents defense counsel submitted in support thereof: the 1993 "Mental Health Evaluation" performed by a clinical psychologist, and a 1989 letter to the Defendant from a psychological examiner. The 1993 evaluation references a possible organic component to the Defendant's behavioral problems, and the 1989 letter references a "diagnostic impression" of "mixed substance abuse and a mixed personality disorder, both severe." Defense counsel argued that the Defendant should be reevaluated for mitigation purposes. The trial judge denied the Defendant's requests for an expert and for a continuance due to considerations of timing and "the nature of the motion," but stated that he would consider the proffered reports "in relation to the general sentencing."

We recognize that
> [i]n the trial and direct appeals of all criminal cases in which the defendant is entitled to appointed counsel . . . the court in an <u>ex parte</u> hearing may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

-10-

Tenn. Sup. Ct. R. 13 § 5(a). See also State v. Barnett, 909 S.W.2d 423, 431 (Tenn. 1995). Indeed, this Court has previously reviewed a trial court's denial of expert assistance in conjunction with a defendant's efforts to develop mitigation evidence in a non-capital case. See State v. Donavan Edward Daniel, No. W2000-00981-CCA-R3-CD, 2001 Tenn.Crim. App. LEXIS 967, at *26-34 (Jackson, Dec. 28, 2001). In this case, however, the Defendant did not make his request for the provision of an expert until mid-way through his sentencing hearing, although he relied on information available to him in 1989 and 1993 in making his request. The verdict against the Defendant was returned on January 19, 2001. The Defendant did not request the provision of expert services until March 16, 2001, after the State had already rested its case in the sentencing hearing.[4] Accordingly, the Defendant coupled his request with a motion for a continuance, which the trial court denied.

"A trial court's denial of a request for a continuance will only be reversed upon a showing of abuse of discretion." Coe v. State, 17 S.W.3d 193, 218 (Tenn. 2000). No such showing has been made here. The Defendant has put forth no excuse as to why he did not move the court for the provision of expert services prior to the commencement of his sentencing hearing. Accordingly, he has not demonstrated that the trial court abused its discretion in denying his motion for a continuance.

Moreover, before an indigent criminal defendant is entitled to expert services at the State's expense, "the defendant must make a threshold showing of particularized need." Barnett, 909 S.W.2d at 431. In order to make such a showing, "[t]he defendant must demonstrate by reference to the facts and circumstances of his particular case that appointment of a[n] . . . expert is necessary to insure a fair trial." Id. Furthermore, "[w]hether or not a defendant has made the threshold showing is to be determined on a case-by-case basis, and in determining whether a particularized need has been established, a trial court should consider all facts and circumstances known to it at the time the motion for expert assistance is made." Id. The trial court's decision of whether to authorize such services will not be reversed on appeal absent a showing of an abuse of discretion. See id.

The Defendant has failed to demonstrate that the trial court abused its discretion in denying his motion for expert services. His general assertion at the sentencing hearing that he "may have been acting under some sort of physical or mental debility" was simply not sufficient to demonstrate how a further psychological evaluation may have served to mitigate his sentences. The trial court had at its disposal the information contained in the two documents submitted by the Defendant, and determined that neither of these indicated the need for further evaluation in the context of sentencing. The Defendant having failed to demonstrate that the trial court's ruling was an abuse of discretion, we find this issue to be without merit.

The Defendant also contends that the trial court erred when it applied certain enhancement factors to his sentences, refused to apply any mitigating factors, and thereby sentenced him to the

---

[4]The Defendant's previous "request" was not for the provision of expert services, but simply that the Defendant be examined by the prison psychologist.

maximum terms for each crime. When an accused challenges the length, range, or manner of service of a sentence, this Court has a duty to conduct a <u>de novo</u> review of the sentence with a presumption that the determinations made by the trial court are correct. <u>See</u> Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." <u>State v. Ashby</u>, 823 S.W.2d 166, 169 (Tenn. 1991).

When conducting a <u>de novo</u> review of a sentence, this Court must consider: (a) the evidence, if any, received at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement made by the defendant regarding sentencing; and (g) the potential or lack of potential for rehabilitation or treatment. <u>See</u> Tenn. Code Ann. §§ 40-35-102, -103, -210; <u>State v. Brewer</u>, 875 S.W.2d 298, 302 (Tenn. Crim. App. 1993); <u>State v. Thomas</u>, 755 S.W.2d 838, 844 (Tenn. Crim. App. 1988).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. <u>See</u> <u>State v. Pike</u>, 978 S.W.2d 904, 926-27 (Tenn. 1998); <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

The Defendant was convicted of aggravated rape, a Class A felony, and aggravated burglary, a Class C felony. <u>See</u> Tenn. Code Ann. §§ 39-13-502(b), 39-14-403(b). The presumptive sentence for a Class A felony is midpoint in the applicable range, increased as appropriate by applicable enhancement factors, and decreased as appropriate for applicable mitigating factors. <u>See</u> <u>id.</u> § 40-35-210(c), (e). The presumptive sentence for a Class C felony is the minimum in the applicable range, increased as appropriate by applicable enhancement factors, and decreased as appropriate for applicable mitigating factors. <u>Id.</u> The trial court sentenced the Defendant on the aggravated rape as a Range II, multiple offender, which designation the Defendant does not contest. The Range II sentence for a Class A felony is twenty-five to forty years, with a midpoint sentence of thirty-two and one-half years. <u>See</u> <u>id.</u> § 40-35-112(b)(1). The trial court sentenced the Defendant on the aggravated burglary as a Range III, persistent offender, also uncontested by the Defendant. The Range III sentence for a Class C felony is ten to fifteen years. <u>See</u> <u>id.</u> § 40-35-112(c)(3).

The trial court applied four enhancement factors to the Defendant's sentence for aggravated rape: that the Defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; that he treated the victim with exceptional cruelty during the commission of the offense; that the rape was committed to gratify the Defendant's desire for pleasure or excitement; and the Defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community. <u>See</u> <u>id.</u> § 40-34-114(1), (5), (7), & (8). The trial court also applied factors (1), (7) and (8) to the

Defendant's sentence for aggravated burglary.[5] The Defendant challenges the trial court's use of factors (5) and (7); the State concedes that the trial court erred in applying factor (7), that the Defendant committed the crimes to gratify his desire for pleasure or excitement. We agree with the State that the record simply does not contain sufficient proof to support this factor, and the trial court therefore erred in applying it.[6]

In finding that the Defendant treated the victim with exceptional cruelty during the rape, the trial court relied on the Defendant's treatment of the victim after he ejaculated: he wrapped her up in a comforter, thereby immobilizing her, covered her head in a pillowcase, dragged her into the bathroom, and there attempted to dunk her vaginal area in a sink full of hot water. Failing in that endeavor, he repeatedly splashed the victim's vaginal area with water from his hands. The trial court described these activities as causing further "terror" to the victim after the actual rape.

We agree with the trial court that these facts support application of the "exceptional cruelty" enhancement factor. Our supreme court has recently reiterated that this enhancement factor is properly applied where there is "a finding of cruelty . . . 'over and above' what is required to sustain a conviction for [the] offense." State v. Arnett, 49 S.W.3d at 258. That is, the facts must demonstrate "'a culpability distinct from and appreciably greater than that incident to' the crime." Id. (quoting State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997)). Psychological abuse may constitute exceptional cruelty as contemplated by the enhancement factor. Id.

The victim in this case testified that, after the Defendant ejaculated, he wrapped her in her comforter and put a pillowcase over her head. The Defendant then began dragging the victim. She testified that the Defendant never turned any lights on, and she was not able to see. Certainly, the Defendant's actions in immobilizing the victim, eliminating her ability to see, and dragging her out of her bedroom, would have caused further terror and fear that she was going to be abducted. After the Defendant dragged the victim into her bathroom, he turned on the water in her sink and tried to make her sit in the sink. When the victim struggled, the Defendant put her on the floor on her knees,

---

[5]During the sentencing hearing, the trial court referred only to the rape when discussing application of factor (5). However, the Written Memorandum of Law in Regards to Sentencing filed by the trial court indicates application of factor (5) to the burglary conviction, as well. The written Memorandum also applies enhancement factor (13)(B), that the offenses were committed while the Defendant was on parole, to both convictions. We find it unnecessary to address the discrepancy because (a) the Defendant does not raise it as an issue and (b) we find that the terms imposed are appropriate even without the application of the additional factors referenced in the Written Memorandum.

[6]In applying this factor, the trial court simply found that the "desire for gratification, for pleasure and excitement" is not an essential element of either aggravated rape or aggravated burglary. However, our supreme court has recently reiterated that, "[e]ssential to proper application of this factor is the determination of the defendant's motive for committing the offense" and "evidence of ejaculation, by itself, does not prove that the rapist's motive was to gratify a desire for pleasure." State v. Arnett, 49 S.W.3d 250, 261-62 (Tenn. 2001) (emphasis in original). Thus, "proper application of factor (7) [to a sentence for rape] requires the State to provide additional objective evidence of the defendant's motivation to seek pleasure or excitement through sexual assault." Id., 49 S.W.3d at 262. Such evidence could include "sexually explicit remarks and overt sexual displays made by the defendant, such as fondling or kissing a victim or otherwise behaving in a sexual manner, or remarks or behavior demonstrating the defendant's enjoyment of the sheer violence of the rape." Id. As recognized by the State in its brief, the record in this case simply does not contain the requisite proof for the application of this enhancement factor to either of the Defendant's sentences.

took "very hot water from the sink," and "washed off [her] vaginal area several times." This tactic, we believe, was exceptionally cruel in adding to the victim's sense of violation and humiliation and, combined with immobilizing and blindfolding the victim, demonstrate the requisite culpability "distinct from and appreciably greater than that incident to" the aggravated rape. Accordingly, we find that the trial court properly applied this enhancement factor and this issue is therefore without merit.

Finally, the Defendant contends that the trial court erred in refusing to apply any mitigating factors. He claims that an "in-depth mental exam" might have confirmed earlier reports of a possible organic brain dysfunction; that he submitted proof of "his lack of violent nature" and "helpful and polite nature"; and that his "good reports . . . while incarcerated" all should have served to save him from maximum sentences.

In considering mitigation, the trial court acknowledged that "some witness[es] indicate that when the defendant wasn't in prison, he seemed like a nice guy. Sometime back in 1996, some people wrote a letter for him, which is good. But nothing that really mitigates the crime." The trial court then concluded that "[u]pon a review of all the proof, the Court can find no substantial mitigating factor in this case." The court then ruled that "the enhancing factors are so overwhelming in this case that the Court would not be warranted in sentencing any . . . except the maximum provided by law."

It is the Defendant's burden to demonstrate to this Court that the trial court erred in its findings with respect to mitigation. The Defendant has simply failed to carry this burden. The record supports the application of three enhancement factors to the Defendant's sentence for aggravated rape, and the application of two enhancement factors to his sentence for aggravated burglary. These factors, combined with the lack of mitigating factors, support the trial court's imposition of maximum terms for the Defendant's convictions. This issue is, therefore, without merit.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE