# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### June 17, 2003 Session

## STATE OF TENNESSEE v. DONALD RAY LOVELL

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-B-1175     J. Randall Wyatt, Jr., Judge**

---

**No. M2002-02379-CCA-R3-CD - Filed September 17, 2003**

---

The Davidson County Grand Jury indicted the Defendant for aggravated gambling promotion. The trial judge denied the Defendant's preliminary motion to suppress certain evidence, and a Davidson County jury found the Defendant guilty as charged. The court sentenced him to two years of probation, a $1,000 fine, and five hours of unpaid community service per month for twenty-four months. He now appeals claiming: (1) that the trial court erred in failing to suppress physical evidence gathered during and incriminating statements made as a result of a warrantless search; and (2) that the evidence was insufficient to support a conviction for aggravated gambling promotion. Finding no reversible error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Peter J. Strianse, Nashville, Tennessee (at trial and on appeal), and Dale M. Quillen, Nashville, Tennessee (at trial), for the appellant, Donald Ray Lovell.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Elizabeth T. Ryan, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Janice H. Bossing and John Zimmermann, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

A 911 call made in response to a robbery instigated the present case. Stephanie Bates, a record keeper for the Metropolitan Nashville Police Department Communications Division, identified a tape that she prepared of the 911 call, which was received at 9:20 p.m. on January 6, 2001, and related radio traffic between the dispatcher and police officers, and it was played at trial

and entered into evidence. During the taped conversation, the caller identified himself as Donald Lovell, the Defendant. Thereafter, the Defendant stated that a robbery was in progress at 2602 Belmont Boulevard, that the robber had a gun and wore a black mask and an army jacket, and that two women were still inside the house. The Defendant also stated that at least one of the women was still tied up, and he did not know whether the robber was still in the house. On cross-examination Bates quoted the transcript of the call and noted that the Defendant said that the robber was inside the house when he arrived there.

Nicholas Falcone, an officer with the Metropolitan Nashville Police Department, testified that he was on patrol on January 6, 2001 and was dispatched to 2602 Belmont Boulevard in response to a robbery call. He stated that he had been driving toward the given address when he came across the Defendant on a side street. The officer testified that when the officer saw the Defendant he had a phone in his hand and flagged the officer down. According to Falcone, the Defendant got in the car, and they rode together to the scene, where the Defendant remained by the car while Officer Falcone joined other officers in examining the house. The officer reported that they found two other victims of the robbery inside. He stated, "I was one of the last ones to go in. Some other guys went in first to clear the house, make sure there w[eren't] anymore suspects in there."

Officer Falcone testified that inside the house, he saw a table with calculators and banded pieces of paper with numbers on them. He stated that in the kitchen, they found several brown paper bags with "the date and some . . . money . . . [ and letters were written on the bags] like 'DJ' for Dow Jones, . . . referring to . . . actual numbers." He asserted that the dates were all within about a week of January 6, 2001. He further stated that around the couch on the floor he saw a few white tie wraps, such as police use when they do not have handcuffs, which had apparently been used to tie up the victims. Officer Falcone stated that the Defendant said little at first, but eventually admitted the location was used as a "numbers house." Falcone testified that the Defendant admitted he was counting the daily numbers slips at the time of the robbery.

Chris Hendry, an officer with the Nashville Metropolitan Police Department, testified that he also investigated the January 6, 2001, robbery at 2602 Belmont Boulevard. He stated that he and Officer Daniel Schager rode to the scene together, where they met another officer and the Defendant. He stated that the officers then approached the house and knocked on the door, and two women came out and had a brief conversation with the officers about the possibility of one or more suspects still being in the house. He asserted, "Nobody could state for a fact . . . that the suspect had an accomplice or not or whether or not that person could be in the house."

Officer Hendry testified that the officers then entered the house to ensure that there were no other suspects inside. He testified that upon entering, he found in plain view a series of calculators and numbers paraphernalia on tables. He also stated that in the kitchen, they found several open brown paper bags containing number slips and tickets. He explained that a numbers ticket is a receipt from a wager in which people bet that certain numbers will come up on a specified lottery on a specified date. He claimed he had seen thousands of slips such as the ones he was describing and that these particular slips had money amounts on them.

Officer Hendry reiterated his earlier statement that two women were inside the house, but stated that he had limited contact with them. He testified that when the women were asked to come outside to speak with the officers, they walked out the front door and pulled it closed behind them. He stated that the Defendant actually took him into the house. Although Officer Hendry described it as a residence, he noted that it actually appeared to be strictly a "counting house," as there was no bedding, furniture for sleeping, plates, or china. He acknowledged that he did not do any paperwork on the case, but testified from memory, using others' materials to refresh his memory as to the date and time of the incident.

Ryan Sledge, another officer with the Metropolitan Nashville Police Department, testified that he was also involved in the January 6, 2001, investigation at 2602 Belmont Boulevard. In describing the scene inside the house, he noted several tables lined up together, paper, and calculators. He testified that the officers looked inside the house to ascertain whether there were any other suspects still in the house because the victims were unsure whether any suspects remained. He acknowledged that a sweep of the house did not provide any robbery suspects. He identified the Defendant in court as having been the man in the house with the two women that day. On cross-examination Officer Sledge testified that he made no written memorandum of the described events other than some citations. He had with him at trial an extensive file of the case that he received from the prosecutor and that he used to refresh his memory, although he acknowledged that he wrote only the two pages of citations in the file.

Daniel Schager, a law enforcement officer of eleven years, estimated that he had investigated fifty or more numbers cases. He testified that around 10:00 p.m. on January 6, 2001, he responded to a call about an armed robbery at 2602 Belmont Boulevard. He stated that the door was partly open when he arrived, so he opened it and found a woman standing inside with her nose to the wall. She was apparently reluctant to turn around until Officer Schager got her attention and told her he was a police officer. He stated that she was also reluctant to say anything. He testified that she said she did not know whether anyone else was in the house, so at that point, the officers performed a protective sweep to ascertain the occupants of the house.

Officer Schager testified that during the sweep, he noted that there was "paper . . . on the windows so it was only lit up by electric lights." He described two banquet-style tables, adding machines, rolls of paper, rubber bands, pens, and four chairs. In his opinion, it did not appear to be a residence. In court, he identified the Defendant as having been at the house that night. He testified that although the Defendant made no statements directly to him, he overheard the Defendant say that the house was a numbers counting house.

Officer Schager testified that inside the kitchen, he saw grocery bags full of numbers and numbers slips with dates in organized bundles. He identified the bags in court and described them as bearing the initials 'DJ,' which he understood to mean the Dow Jones Industrial Average. He gave his opinion that the slips and receipts bore initials to identify certain people and that the numbers were for a lottery in another state. He estimated that he saw thousands of tickets in the house the night of the incident.

Jonathan Riggs, also of the Metropolitan Nashville Police Department, testified that he was in charge of collecting and maintaining the evidence from the 2602 Belmont. At trial, he identified a number of calculators and a telephone recovered from the house. He also testified to finding trash bags full of tickets, envelopes, letters, numbers, and office supplies, such as paper for the calculators. Subsequent to his in-court identification, the evidence recovered from the house was entered as exhibits.

After an offer of proof, the court permitted Officer Milton Elrod to testify about his experience and training and about the significance of the records and evidence gathered from 2602 Belmont. Although all gathered evidence was filed with the record, including number slips dated prior to January 6, 2001, the court limited Officer Elrod's testimony to the evidence dated January 6. The court also limited the evidence for the jury's viewing to the numbers slips dated January 6, in addition to the calculators and other office supplies.

Officer Milton Elrod testified that he worked in the gambling squad of the Vice Division of the Metropolitan Nashville Police Department. He stated that he had been a police officer for seventeen years and had investigated gambling operations for five years, and that he had been involved in hundreds of gambling investigations and the execution of related search warrants. Regarding the evidence in this particular case, he explained that the 'MD' marking on the tickets denoted a mid-day Illinois lottery. He said that numbers operations usually play Dow Jones, but that was only available on weekdays. He also explained that coding on the tickets indicated where the purchasers went to buy them and redeem winners. He explained that the custom in the business was to use red ink to mark groups of tickets and denote winners, as was apparently done on the tickets found on January 6. He also explained that the remaining letters on the tickets were probably people's initials or abbreviated names. Finally, he explained that the markings on the back of winning tickets denoted the amount bet, the amount won, and the winning numbers.

## II. Analysis
## A. Suppression of Evidence

On appeal, the Defendant contends that the trial court erred in refusing to suppress two forms of evidence at trial: fruits of a warrantless search and incriminating statements made by the Defendant when confronted with the fruit of that warrantless search without first having received his Miranda warnings. However, with regard to the Defendant's statements to officer Falcone, we conclude that the Defendant waived this issue. Our review of the record indicates that the Defendant failed to raise this issue in his motion for new trial. Consequently, it is waived. See Tenn. R. App. P. 3(e) (stating that "An appeal as of right to the . . . Court of Criminal Apeals shall be taken . . . [p]rovided, however, that in all cases tried by a jury, no issue presented for review shall be predicated upon an error . . . or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived"); State v. Caughron, 855 S.W.2d 526, 538 (Tenn. 1993). Having so determined, we proceed to the issue of the admissibility of fruits of the warrantless search.

-4-

When reviewing a trial court's ruling on a motion to suppress, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Findings of fact made by a trial court in ruling on a motion to suppress are binding upon this court unless the evidence preponderates against the findings. See id. However, "[t]he application of the law to the facts found by the trial court . . . is a question of law which this court reviews de novo." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

Specifically, Defendant argues that the search conducted of 2602 Belmont was warrantless, nonconsensual, and did not fall within any of the recognized exceptions to the Fourth Amendment protection against unreasonable searches and seizures and, as such, that all evidence derived from that search is inadmissible. The Fourth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

Article I § 7 of the Tennessee Constitution provides that:

> [P]eople shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

Both of these constitutional provisions are intended to "'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Randolph, 74 S.W.3d 330, 334 (Tenn. 2002) (quoting Camara v. Municipal Court, 387 U.S. 523, 528 (1967)).

Under both the federal and state constitutions, warrantless searches are presumed unreasonable, and evidence obtained from such a seizure should be suppressed unless the State demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. See Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); Yeargan, 958 S.W.2d at 629. The main exceptions to the requirement for a search warrant are: (1) consent; (2) incident to a lawful arrest; (3) probable cause to search with exigent circumstances; (4) in hot pursuit; (5) a stop and frisk situation; and (6) plain view. See State v. Bartram, 925 S.W.2d 227 (Tenn. 1996); see also Taylor v. State, 551 S.W.2d 331, 334 (Tenn. Crim. App. 1976). "If the circumstances of a challenged search and seizure come within one of the recognized exceptions, the fruits of that search and seizure are not subject to operation of

the exclusionary rule and may be properly admitted into evidence." State v. Shaw, 603 S.W.2d 741, 742-43 (Tenn. Crim. App. 1980).

The search in this case was permissible under the warrant requirement exception of probable cause to search with exigent circumstances. "[P]olice officers may not enter a suspect's home to make a warrantless arrest, even if the arrest is based on probable cause, unless there are exigent circumstances excusing the necessity of a warrant." State v. Elliott, No. W1999-00361-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 9, at *10 (Tenn. Crim. App. Jan. 5, 2001); see also Payton v. New York, 445 U.S. 573, 590 (1980).[1] "Exigent circumstances are limited to three situations: (1) when officers are in 'hot pursuit' of a fleeing suspect; (2) when the suspect presents an immediate threat to the arresting officers or the public; or (3) when immediate police action is necessary to prevent the destruction of vital evidence or thwart the escape of known criminals." State v. Givens, No. M2001-00021-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 920, at *10 (Tenn. Crim. App. Nov. 29, 2001); see also Jones v. Lewis, 874 F.2d 1125, 1130 (6th Cir. 1989). "The mere existence of these circumstances does not necessarily validate a warrantless search. . . . There must be a showing by those asserting the exception that the exigencies of the situation made the search imperative." Yeargan, 958 S.W.2d at 635.

The burden of justifying a warrantless search under the exigent circumstances exception rests upon the prosecution, and courts must conduct a two-step inquiry to determine whether that burden has been met. State v. Findley, No. 03C01-9406-CR-00194, 1995 Tenn. Crim. App. LEXIS 205, at *6-7 (Tenn. Crim. App. Mar. 14, 1995) (referring to People v. Duncan, 720 P.2d 2, 5 (Cal. 1986)).

> First, the Court must look "to what the officer knew or believed and what action he took in response." Then the Court must determine the legal question of "whether that action was reasonable under the circumstances." "As a general rule, the reasonableness of an officer's conduct is dependent upon the existence of facts available to him at the moment of the search or seizure which would warrant a man of reasonable caution in the belief that the action taken was appropriate." In determining whether the officer acted reasonably, due weight must be given to "the reasonable inferences which he is entitled to draw from the facts in light of his experience." This does not mean he can point to "unparticularized suspicions," or "hunches," but he must be able to point to specific and articulable facts from which he concluded that his action was necessary.

Findley, 1995 Tenn. Crim. App. LEXIS 205, at *6-7 (citing Duncan, 720 P.2d at 5). The Supreme Court has upheld a warrantless search under the exigent circumstances exception where police were informed that an armed robbery had taken place and had reasonable belief as to the suspect's location, declaring that "speed . . . was essential, and only a thorough search of the house for persons and weapons could have insured that [the defendant] was the only man present and that the police

---

[1] Probable cause is "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998).

had control of all weapons which could be used against them or to effect an escape." Maryland Penitentiary v. Hayden, 387 U.S. 294, 299 (1967).

In this case, the Defendant himself called 911 in response to an armed robbery and requested assistance. As a citizen informant, his statements were presumptively reliable. See State v. Cauley, 863 S.W.2d 411, 417 (Tenn. 1993); see also State v. Moon, No. 01C01-9401-CC-00023, 1994 Tenn. Crim. App. LEXIS 570, at *7 (Tenn. Crim. App. Sept. 1, 1994).[2] Upon arriving on the scene, Officer Schager found the door to the house ajar, opened it further, and found one of the female victims inside the doorway with her nose to the wall in a fearful state. Although the Defendant told the officers that the robber had already left, neither he nor either of the female victims was able to state for a fact that there had been only one robber or that there were no longer suspects in the house. These circumstances constituted probable cause for the police to enter the house and ensure that their safety and the safety of those inside the house was no longer in danger. Further, the "exigent circumstances" element of this exception was met by the uncertainty of whether or not any criminals remained in the house, and by extension, the uncertainty of whether the officers and others present were faced with an immediate threat. Additionally, such search may have been necessary to prevent the escape of any robbers if there had been more than one, a fact unknown at the time.

Once the officers were lawfully inside the house, they could seize the evidence found under the authority of the other previously discussed exceptions to the warrant requirement, under the plain view doctrine and within the bounds of a protective sweep. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant . . . . Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. . . . [T]he 'plain view' doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object." Coolidge, 403 U.S. at 465-466.

It appears from the record that much of the gambling paraphernalia seized by the officers in this case was found in plain view when the officers entered the house. Some of the seized evidence was found in the kitchen; however, even it was lying openly on the floor. All officers testified to seeing the tables, calculators, bags of numbers tickets, and other various office supplies upon first entering the house. Their assessments as to the lack of customary living amenities was also based on a plain view assessment of the house. Although the material ultimately seized was not the object of the officers' search, it was incriminating evidence found after the initial permissible intrusion into the house and was therefore subject to seizure under the plain view doctrine.

---

[2]In this case, the Defendant was acting as a citizen/bystander witness when he called 911. Information received from a citizen informant is presumptively reliable and is not subject to the two-prong Aguillar-Spinelli test of reliability that applies to information received from confidential informants. Cauley, 863 S.W.2d at 417; see also Spinelli v. United States, 393 U.S. 410 (1969); Aguilar v. Texas, 378 U.S. 108 (1964).

## B. Sufficiency of Evidence

The Defendant next contends that the evidence adduced at trial was insufficient to sustain his conviction for aggravated gambling promotion. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). However, before the accused may be convicted from purely circumstantial evidence, "the circumstances must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

Aggravated gambling promotion, a Class E felony, occurs when "[a] person . . . knowingly invests in, finances, owns, controls, supervises, manages or participates in a gambling enterprise." Tenn. Code Ann. § 39-17-504(a), (c). "Gambling enterprise" is defined as "two (2) or more persons regularly engaged in gambling promotion . . . ." Tenn. Code Ann. § 39-17-504(b). Gambling promotion, a Class B misdemeanor, is defined as follows:

> (a) A person commits an offense who knowingly induces or aids another to engage in gambling, and: (1) Intends to derive or derives an economic benefit other than personal winnings from the gambling; or (2) Participates in the gambling and has, other than by virtue of skill or luck, a lesser risk of losing or greater chance of winning than one (1) or more of the other participants.

Tenn. Code Ann. § 39-17-503.

In the present case, the officers went to 2602 Belmont Boulevard in response to a 911 call regarding an armed robbery. On the way there, Officer Falcone discovered the Defendant on a side street and took him back to the location. When all officers arrived at the house, they found two women inside and asked them to come out. Neither the women nor the Defendant could state for a fact that there had been only one perpetrator, or that the house was by then free of robbers. Despite their lack of a search warrant, the officers then proceeded to do a protective sweep of the house to ensure that no dangerous suspects remained inside and that no one's safety was at risk. This search, as previously discussed, was proper and permissible.

Once inside the officers discovered in plain view tables, calculators, pens, a phone, chairs, bags of envelopes and numbers tickets, and ties that had allegedly been used to bind the robbery victims. Officer Elrod testified, based on his experience in hundreds of numbers investigations, that tickets found in the house were numbers tickets, and explained that their markings denoted amounts and numbers bet and locations for redeeming winning tickets. He further testified that markings customarily used in the illegal business were found on the tickets, envelopes, and bags, including red ink to mark winning tickets and initials indicating certain lotteries or the Dow Jones as the basis for determining winners.

The Defendant was present in the house at the time of the robbery and made the 911 call. Two other women were inside the house when the officers arrived. The wealth of physical evidence found in the house could support a finding that the people present "regularly engaged in gambling promotion." Tenn. Code Ann. § 39-17-504(b). Given these circumstances, the evidence was sufficient to sustain a finding of the Defendant's guilt on the charge of aggravated gambling promotion.

The trial court judge explicitly acknowledged that "this is a circumstantial case if it's anything." It is true that "when a case is made by circumstantial evidence alone, . . . the circumstances must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Crawford, 470 S.W.2d at 612. However, the evidence when taken together was sufficient to overcome even this higher burden. The Defendant had been at the house when it was robbed, and he made the 911 call. The responding officers found no evidence in the house consistent with residential use; instead, everything found was indicative of a gambling operation. Officer Elrod's testimony thoroughly described the numbers tickets, their markings, and how they are played. A jury could come to no other reasonable hypothesis other than that the Defendant was engaged in aggravated gambling promotion.

Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE