STATE of Tennessee, Plaintiff–Appellee,

v.

James Kelly CAULEY, Defendant–
Appellant.

Supreme Court of Tennessee,
at Nashville.

Oct. 4, 1993.

Charles W. Burson, Atty. Gen. and Reporter and Jerry L. Smith, Deputy Atty. Gen., Nashville, for plaintiff-appellee.

Michael R. Jones, Public Defender, Springfield, for defendant-appellant.

## OPINION

DROWOTA, Justice.

In this double murder case the Defendant, James Kelly Cauley, has appealed from the Court of Criminal Appeals' affirmance of his conviction on two counts of first-degree murder. We granted the Defendant's application for permission to appeal in order to review the validity of a search warrant issued and executed in Kentucky pursuant to an investigation into the murders being conducted by Tennessee law enforcement officials. As explained below, we hold that Tennessee law, not Kentucky law, controls the present controversy. We further find that, in cases such as this one, Tennessee law enforcement officials should have the opportunity to present extrinsic proof in Tennessee suppression hearings to support search warrants issued at the request of Tennessee officials in other states in conformity with that state's law.

### I.

The record in this case, as accredited by the jury's verdict, see State v. Williams, 657 S.W.2d 405, 410 (Tenn.1983) (a jury's verdict, once approved by the trial judge, accredits the testimony of witnesses for the State and resolves all conflicts in proof in favor of the State), establishes that in May, 1988, the Defendant and his older brother, Larry Glenn Cauley, Jr., sold stolen cattle to Wayne Tinnon, a cattle dealer. Tinnon paid for the cattle in cash, at which time the Defendant discovered that Tinnon carried substantial sums of money on his person when he purchased cattle. Tinnon subsequently agreed to help David Mandrell, a

detective with the Sumner County Sheriff's Department, investigate the sale of the stolen cattle.

The Defendant and his brother arranged a bogus cattle sale with Tinnon to be held on June 28, 1988, at 10 a.m., on a remote farm which had been leased by the Cauley family for several years. This farm was located in Tennessee, just south of the Kentucky–Tennessee border in Robertson County. The Defendant lived with his parents in their home in Kentucky, approximately three miles from the farm where the purported sale was to take place. On the evening of June 27, the day before the arranged sale, Tinnon contacted Detective Mandrell and informed him of the sale planned for the following morning. The two men agreed to meet at 9:30 the next morning, June 28, at a specified location and then proceed together to the desolate farm to meet with the Defendant and his brother.

Tinnon and Mandrell met as planned at 9:30 a.m. on June 28, and then traveled in Tinnon's vehicle to the Cauley farm. Upon arriving, they parked near a barn. Tinnon and the Defendant's brother waited outside the barn while Mandrell entered the barn where the Defendant was waiting. When Mandrell walked past a stall where the Defendant was located, the Defendant shot him first in the back and then in the head with a .30–06 rifle he had previously taken from his father's home. The Defendant's brother then shot Tinnon, who was still outside of the barn, in the back with a .32 caliber pistol, which had also been taken from the Defendant's father's house by the Defendant. When Tinnon attempted to run away after the first shot, he was shot four additional times. The two dead victims were then robbed of their wallets and any money in their possession. The rifle shots were heard by a farmer over a mile away at approximately 10 a.m. Witnesses placed the brothers near the farm shortly before and after the shots were heard. The rifle and pistol, which belonged to the Defendant's father, were shown at trial to have been the murder weapons. The Defendant's prints were found on both guns. The bodies of Tinnon and Mandrell were discovered later in the

day when Mandrell failed to report in. While awaiting trial for the murders of Tinnon and Mandrell, the Defendant admitted to a cellmate that he and his brother killed the men, and also volunteered numerous details about the crimes. He also bragged that a jury would never convict him.

The Defendant was convicted by a jury of two counts of first-degree murder. He was sentenced to consecutive life terms for the crimes. The Defendant has appealed to this Court, raising several issues, including the sufficiency of the search warrant which formed the basis of the search of the Defendant's father's home in Kentucky where the Defendant was living. The two murder weapons were found in that search. We granted review to address the search warrant issue.

II.

Approximately one week after the murders, on July 5, 1988, an agent with the Tennessee Bureau of Investigation sought and obtained a Kentucky search warrant to search the home of the Defendant's parents in Kentucky. The Defendant lived at that residence. In obtaining the search warrant, the TBI agent submitted his affidavit to a Kentucky judge. The affidavit states in part:

AFFIDAVIT FOR SEARCH WARRANT

COMMONWEALTH OF KENTUCKY

COUNTY OF SIMPSON

The affiant ..., Special Agent for the Tennessee Bureau of Investigation, having been first duly sworn states that he has reasonable and probable grounds to believe, and that he does verily believe, that a .30–06 caliber rifle and a .32 caliber pistol and ammunition and spent shell casings therefor are now on the premises known as the residence of Larry G. Cauley, Sr., and numbered as 1189 Minnicks–Johnson Road, Franklin, Simpson County, Kentucky

. . . .

Affiant states that there is probable and reasonable cause to believe, and that the affiant does believe, that the aforementioned weapons constitute evidence which

tends to show that a crime has been committed by the use of said weapons and that a particular person or persons has committed the crime of murder by the use of those weapons.

Affiant has been an officer in the aforementioned agency for a period of four years and the information and observations contained herein were received and made in his capacity as an officer thereof.

On June 28, 1988, Officer David Mandrell of the Sumner County Sheriff's Office, and Wayne Tinnon, a private individual, were murdered by gunshot wounds from a .30–06 rifle and a .32 caliber pistol. Pursuant to a continuing investigation, Officer David Mandrell advised other officers that he and Tinnon were scheduled to meet with Larry Glen Cauley, Jr., and perhaps others at a designated location in Robertson County, Tennessee. David Mandrell was last seen alive at 9:30 a.m. on June 28, 1988. David Mandrell and Wayne Tinnon were found murdered in Robertson County, Tennessee, at approximately 5:30 p.m. on June 28, 1988. A witness whose identity is known to this affiant saw an automobile known to belong to Larry G. Cauley, Jr., arrive at the residence of Larry G. Cauley, Sr., between 9:45 a.m. and 10:15 a.m. on June 28, 1988. An occupant of the vehicle left the vehicle, entered the residence of Larry G. Cauley, Sr., above-described, remained for approximately one minute to five minutes and returned to the vehicle, which then departed. The affiant has on this date interviewed Larry G. Cauley, Sr., who has admitted owning a .30–06 rifle and a .32 caliber pistol. The residence of Larry G. Cauley, Sr., is located a short distance from the scene where the bodies of Mandrell and Tinnon were discovered.

Your affiant has reasonable and probable cause to believe that the weapons used in the murder of Mandrell and Tinnon are the weapons owned by the said Larry G. Cauley, Sr., and that said weapons are presently situated on or about the above-described premises. On the basis of the foregoing information, this affiant requests that a search warrant be issued. . . .

Based upon this affidavit, the Kentucky judge issued a search warrant for the Cauley residence in Kentucky, ordering Kentucky law enforcement officials to seize the .30–06 rifle and the .32 caliber pistol and turn them over to the TBI agent. The search itself was conducted by officers from the Robertson County Sheriff's Department (the murders occurred in Robertson County), the TBI, and Kentucky law enforcement personnel. The .30–06 rifle used to kill Mandrell was discovered in the Defendant's bedroom and the .32 caliber pistol used to kill Tinnon was found in another bedroom. Both weapons belonged to the Defendant's father, and both weapons contained the Defendant's fingerprints. The Defendant told a cellmate that he had taken the guns from his father's home, used them to kill Tinnon and Mandrell, and then returned them to his father's house after the murders.

The Defendant moved to suppress the murder weapons discovered in the search of his parents' home in Kentucky pursuant to the Kentucky search warrant obtained by Tennessee authorities. The trial court, applying Tennessee law, held, after a suppression hearing, that the affidavit was sufficient to support the search warrant. The Court of Criminal Appeals, applying Kentucky law, found that the affidavit established probable cause for the issuance of the search warrant. The decision of the Court of Criminal Appeals was released prior to this Court's decisions in *Dillon v. State*, 844 S.W.2d 139 (Tenn.1992) and *State v. Hudson*, 849 S.W.2d 309 (Tenn.1993), which are discussed below.

The Defendant claims, based upon *Dillon* (and presumably *Hudson*), that the search warrant should be analyzed under the stricter search and seizure standards of Tennessee law, not Kentucky law. More particularly, he claims three specific deficiencies in the affidavit supporting the warrant. First, he alleges that the identification of the murder weapons in the affidavit is a baseless conclusion of fact by the TBI agent. Stated another way, he says that the TBI agent had an insufficient basis for concluding that the murder weapons were a .30–06 rifle and .32 caliber pistol, and that this undermined the probable cause determination of the issuing

magistrate. Second, the Defendant alleges that the TBI agent made false or misleading statements in the affidavit. Third, and most significantly, he alleges that the affidavit fails to comply with this Court's decision in *State v. Jacumin*, 778 S.W.2d 430 (Tenn.1989), holding that affidavits and search warrants must comply, under Article I, Section 7 of the Tennessee Constitution, with the two-pronged test of *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

### III.

■ It is necessary first to address the question of whether Tennessee or Kentucky law governs the validity of the search warrant at issue. If Tennessee law applies, the sufficiency of the affidavit must be determined by reference to the standards announced in *Jacumin, supra.* In *Jacumin*, the Court rejected the "totality of the circumstances" test enunciated in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and held that the proper standard by which probable cause must be measured under Tennessee law is the two-pronged "reliability-basis of knowledge" test set forth in *Spinelli* and *Aguilar, supra. Meadows v. State*, 849 S.W.2d 748, 750 (Tenn.1993). If, on the other hand, Kentucky law applies, the appropriate standard is the "totality of the circumstances" rule of *Gates*, along with the good faith exception to the exclusionary rule. *Crayton v. Commonwealth*, 846 S.W.2d 684 (Ky.1992); *Whisman v. Commonwealth*, 667 S.W.2d 394 (Ky.App. 1984).

■ The choice of law question in this case is controlled by our decisions in *Dillon* and *Hudson*, both of which were decided after the intermediate court released its opinion in this case. In *Dillon*, federal agents seized a pistol, believed to have been used in a murder, from a safety deposit box in Florida pursuant to a federal search warrant obtained as part of an investigation conducted by federal law enforcement officials. The search warrant was based upon an affidavit of a federal agent resulting from a lengthy federal investigation into the defendant's ex-

tensive criminal activities. *Dillon*, 844 S.W.2d at 143. Once seized, the pistol was turned over to Tennessee authorities and used in a Tennessee prosecution of the defendant for murder. The defendant argued that the federal search warrant's affidavit should be required to comply with the *Jacumin* standards of search and seizure. We held that the search warrant need only satisfy federal law because the federal agents who obtained the warrant in Florida were acting independently of Tennessee law enforcement officials. *Id.* at 144. More precisely, this Court determined that the federal agents in Florida were acting independently of Tennessee authorities in conducting the search and, therefore, there was no agency relationship which would trigger Tennessee's higher constitutional protections. In explaining the basis for this holding, we stated:

> [I]n determining the validity of a search and seizure conducted by officers of another jurisdiction, the critical assumption that obviates the application of the state constitution is that the state's constitutional goals will not thereby be compromised. In our jurisdiction, we recognize that an essential objective of our constitutional prohibition against unreasonable search and seizure and the remedial exclusionary rule is to deter unlawful police conduct. These constitutional protections may also implicate concerns of judicial integrity. Further, the exclusionary rule serves to vindicate the impairment of an individual's state constitutional right to be free from unreasonable search and seizure.

> None of these constitutional values, however, is genuinely threatened by the search and seizure of evidence, conducted by officers of another jurisdiction under the authority and in conformity with the law of their own jurisdiction, that is totally independent of our own government officers. Thus, in that context, no purpose of deterrence relating to the conduct of state officials is frustrated, because it is only the conduct of another jurisdiction's officials that is involved. Judicial integrity is not imperiled because there has been no misuse or perversion of judicial process. Further, no citizen's individual constitutional rights fail of vindication because no state

official or person acting under color of state law has violated the state constitution.

*Id.* at 143–44 (quoting *State v. Mollica,* 114 N.J. 329, 554 A.2d 1315, 1328 (1989)). Thus, *Dillon* stands for the proposition that the law of the jurisdiction in which the search warrant is obtained and executed should govern its validity, unless law enforcement officers there were acting as agents of the State of Tennessee. When such an agency relationship exists, Tennessee's constitutional protections come into play, including Tennessee's search and seizure standards.

Soon after *Dillon* was decided, this Court decided *State v. Hudson,* 849 S.W.2d 309 (Tenn.1993). *Hudson* involved a search warrant issued by a federal magistrate and executed in compliance with federal law, but not in compliance with state law. We reiterated the basis for our decision in *Dillon,* and held that if the warrant was secured and executed by federal agents acting "wholly independently" of state officials, then federal law would govern the review of the warrant. *Hudson,* 849 S.W.2d at 312. If, on the other hand, federal agents were acting in conjunction with state officers, or if there was other evidence of intergovernmental agency, then state law would be applicable. *Id.*

█ In the case at bar, the State asserts that *Dillon* (and presumably *Hudson*) were wrongly decided because Tennessee's higher constitutional standards pertaining to search and seizure are somehow being "exported" to other jurisdictions. We disagree. When evidence is used in a Tennessee courtroom that has been obtained at the behest of Tennessee authorities pursuant to their own investigation of a crime occurring within our borders, as in the instant case, Tennessee's constitutional search and seizure principles should apply. In the present case, as conceded by the State, there can be little doubt that the Kentucky search warrant was obtained at the request of Tennessee authorities. The affidavit supporting the warrant came from an agent of the Tennessee Bureau of Investigation. The evidence to be seized was used in a crime occurring in Tennessee, and was specifically obtained for the purpose of turning it over to Tennessee officials for use in a Tennessee prosecution. These circumstances trigger the concerns expressed in *Dillon* and *Hudson.* We hold that the search warrant in this case must comply with Tennessee law.

█ We are not, however, completely unsympathetic with the State's plight in this regard. It is true that when an investigation by Tennessee law enforcement officials extends beyond our borders, the aid of that state's law enforcement will typically be enlisted, leading to the intergovernmental cooperation invoking *Dillon* and *Hudson.* Moreover, magistrates in other states are probably not going to be intimately familiar with Tennessee law and, in any event, would be reluctant to depart from their own state's search and seizure provisions which they are sworn to uphold. Thus, Tennessee law enforcement officials are placed in the position of having to obtain a search warrant in another state in conformity with that state's law, but then defend the validity of that warrant in a Tennessee suppression hearing governed by higher constitutional standards. This can be a difficult task since our courts do not look beyond the face of the warrant absent an allegation of fraud. *State v. Little,* 560 S.W.2d 403, 406–07 (Tenn.1978); *Solomon v. State,* 203 Tenn. 583, 315 S.W.2d 99, 101 (1958). To help alleviate this somewhat awkward situation, we adopt an exception to this general rule, permitting Tennessee law enforcement personnel to introduce extrinsic evidence in support of a search warrant issued in another state in a suppression hearing in Tennessee, in order to demonstrate that the search warrant complies with Tennessee law. The exception will apply only when Tennessee law enforcement personnel have acted in good faith in obtaining and executing the search warrant in the foreign state.

## IV.

█ Having decided that Tennessee law controls the review of the search warrant in this case, we return to the specific deficiencies alleged by the Defendant. He first claims that the warrant is defective because the affidavit states that the victims were "murdered by gunshot wounds by a .30–06

rifle and a .32 caliber pistol." The fact that the officer identified the instrumentalities used to commit the murders in the affidavit in no way impinged upon the magistrate's role of determining probable cause. In any event, the TBI agent testified at the suppression hearing that his "conclusion" was based *upon two underlying facts which were part of* his investigation: (1) statements from the medical examiner that the victims had died from wounds generated by a .32 caliber pistol and a rifle of high caliber, possibly a .30–06 rifle; and (2) a .30–06 rifle shell casing was found at the scene of the murders where it was likely to have been ejected from the rifle used to kill Mandrell. The identification of the murder weapons in the affidavit in no way undermines the sufficiency of the affidavit. If anything, it strengthens it.

Additionally, the Defendant asserts that the TBI agent made false or misleading statements to the magistrate and, therefore, the warrant must be set aside. The Defendant has failed to cite, nor does the record establish, any evidence that the officer made a false statement intended to deceive the magistrate, or a statement that he did not have a reasonable basis to believe at the time he made it. *See, State v. Little,* 560 S.W.2d 403, 407 (Tenn.1978). This issue is without merit.

Finally, and most significantly, the Defendant asserts that the search warrant must be set aside because the affidavit states that "[a] witness whose identity is known to this affiant saw an automobile belonging to [the Defendant's brother] arrive at the residence of Larry G. Cauley, Sr., between 9:45 a.m. and 10:15 a.m. on June 28, 1988." The affidavit goes on to say that "[a]n occupant of the vehicle left the vehicle, entered the residence of Larry G. Cauley, Sr., remained for approximately one minute to five minutes and returned to the vehicle, which then departed." The Defendant complains that the unnamed witness referred to by the TBI agent was a confidential informant and, therefore, the State was required in the affidavit to establish, not only sufficient underlying facts to support the validity of the informant's information, but also that the information was reliable, as required by *State v. Jacumin,* 778

S.W.2d 430 (Tenn.1989). Inasmuch as *Jacumin* dealt with a confidential informant, as contrasted to a citizen witness, the State counters that the *Aguilar–Spinelli* test adopted in *Jacumin* is not applicable.

There is a distinction in Tennessee law between so-called "citizen informants," or bystander witnesses, and "criminal informants," or those from a "criminal milieu". *State v. Melson,* 638 S.W.2d 342, 354–55 (Tenn.1982). Information provided by a citizen/bystander witness known to the affiant is presumed to be reliable, and the prosecution is not required to establish either the credibility of the informant or the reliability of his information. *Melson,* 638 S.W.2d at 354–56. When the source of the information is an unnamed citizen informant, "the reliability of the source and the information must be judged from all the circumstances and from the entirety of the affidavit." *Id.* at 356. The name of a citizen informant is not required to be disclosed in the affidavit. *Id.*

On the other hand, Tennessee law requires information provided by an unnamed criminal informant, as contrasted to an unnamed citizen/bystander informant, to be grounded on the two-pronged showing enunciated in *Aguilar* and *Spinelli.* Specifically, the issuing "magistrate must be informed of both (1) the basis for the informant's knowledge, and either (2)(a) a basis establishing the informant's credibility or (2)(b) a basis establishing that the informant's information is reliable." *State v. Ballard,* 836 S.W.2d 560, 562 (Tenn.1992). "Probable cause may not be found until both prongs have been independently considered and satisfied." *Id.*

In the instant case, the challenged language in the affidavit is "[a] witness whose identity is known to this affiant saw an automobile belonging to [the Defendant's brother] arrive at the residence of Larry G. Cauley, Sr., between 9:45 a.m. and 10:15 a.m. on June 28, 1988." We do not regard this language as indicating that the source of the information was in the nature of a criminal informant's tip—it was non-accusatory and did not describe criminal activity itself. *See Melson,* 638 S.W.2d at 356–57. The fact that a witness saw the Defendant's brother's car arrive at and then depart from Cauley Sr.'s

418

home is innocuous by itself. This innocent detail would lead one to believe that the information was provided by a bystander witness. "Its significance lay in its fitting in with other facts which such a bystander would presumably not know." *Id.* at 356. Of course, it would be preferable for affidavits to identify witnesses when feasible, and to specify whether that individual personally observes what is being described. *Id.* Nonetheless,

> we must interpret affidavits in a common-sense and realistic fashion, eschewing [a] grudging and negative attitude and recognizing that affidavits for search warrants are normally drafted by nonlawyers in the midst and haste of a criminal investigation. (Citation omitted). From that perspective, the reasonable implication of the affidavit is that the [unnamed witness] was a bystander witness, not [a criminal] informant. Treating him as such—and taking into account that the statement, which formed a single link in a circumstantial chain, was non-accusatory—we think the demonstration of credibility and reliability that would be required under *Aguilar* and *Spinelli* in the case of a [criminal informant] is not required here.

*Melson,* 638 S.W.2d at 356–57 (quoting *United States v. Melvin,* 596 F.2d 492, 497 (1st Cir.1979)). Thus, we hold that the information provided by the citizen/bystander witness in this case is presumed to be reliable, and that the prosecution did not have to establish either the credibility of the informant or the reliability of his information. The challenged affidavit is sufficient to support a finding of probable cause.

The result reached by the lower courts is affirmed, but for the reasons stated herein. We have reviewed the other issues raised by the Defendant and find them to be without merit. These issues are adequately addressed by the intermediate court's opinion. Costs are adjudged against the Defendant.

REID, C.J., and O'BRIEN, DAUGHTREY and ANDERSON, JJ., concur.