33 A.3d 435

James William SWEETNEY

v.

STATE of Maryland.

No. 103, Sept. Term, 2010.

Court of Appeals of Maryland.

Oct. 25, 2011.

Reconsideration Denied Jan. 19, 2012.

David W. Lease (Smith, Lease and Goldstein, LLC, Rockville, MD), on brief, for petitioner/cross-respondent.

Gary E. O'Connor, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent/cross-petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, *MURPHY, ADKINS, BARBERA, JJ.

MURPHY, J.

In the Circuit Court for Charles County, a jury convicted James William Sweetney, Petitioner, of robbery and related offenses, including use of a handgun in the commission of a crime of violence. The State's evidence was sufficient to establish that he committed those offenses on July 14, 2006, when he and an accomplice participated in a "home invasion" during which they robbed the victim of several items, including a necklace that was (in the words of Petitioner's brief) "snatched from [the victim's] neck." After the Court of Special Appeals affirmed Petitioner's convictions in an unreported opinion, he requested that this Court issue a writ of certiorari to decide:

1) Whether the Court of Special Appeals erred when it decided that [Petitioner's] constitutional right of confrontation was not violated where the trial court curtailed [Petitioner's] cross-examination of the State's detective regarding the contents of a search warrant return that directly contradicted the detective's direct testimony about recovering a key piece of evidence?

2) [Whether] the Court of Special Appeals err[ed] in failing to reverse [Petitioner's] conviction due to prosecutorial misconduct under a plain error analysis where the Court of Appeals had previously held that the precise type of prose-

---

* Murphy, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

cutorial misconduct at issue was highly prejudicial and jeopardized the fundamental fairness of the trial, or in the alternative, should this Court recognize plain error and correct the denial of [Petitioner's] right to a fair trial due to the prosecutorial misconduct?

We granted the petition. 417 Md. 125, 9 A.3d 1 (2010). For the reasons that follow, we hold that the trial court did not abuse its discretion in "curtailing the cross-examination of the State's detective regarding the contents of a search warrant return" that was prepared by another law enforcement officer who did not testify at trial, and we decline to review any of Petitioner's "plain error" arguments. We shall therefore affirm the judgment of the Court of Special Appeals.

## Background

Petitioner's "confrontation" argument is based upon the theory that, to bolster its case against him, the State presented perjured testimony about what tangible evidence was—and what was not—recovered from (1) the victim's apartment, and (2) the apartment of Petitioner's girlfriend. According to Petitioner, although the victim made an in-court identification of Petitioner as one of the robbers, the fact that the victim had initially stated that he did not know who had robbed him is what motivated the State to present the perjured testimony.

The robbery occurred on the afternoon of Friday, July 14, 2006, when two men forced their way into the victim's apartment. One of the intruders was unmasked, and the other was wearing a ski-mask. Both intruders used handguns to strike the victim's face and head. After the victim had been forced into the bedroom, he lost consciousness. After the victim regained consciousness, one of the intruders grabbed the silver chain that the victim was wearing around his neck, and ripped the chain off the victim's neck. After stealing several items of the victim's personal property, the intruders threw him into a closet, where he remained until five to ten minutes after the intruders left the apartment.

The victim did not initiate the investigation of the robbery, which was first reported by an employee of the Southern Maryland Hospital Center, after the victim had been transported there by a friend. At the hospital, while being interviewed by Detective Chris Shankster of the Charles County Sheriff's Department, the victim initially stated that he did not know who robbed him. Detective Shankster testified that "it was within—probably within the hour of speaking with him. You know, he changed his story." At this point, the victim stated that Petitioner was the masked intruder.

On July 26, 2006, Detective Shankster and other members of the Charles County Sheriff's Department accompanied Washington, D.C. Metropolitan Police Officers who executed a search warrant at 114 Galveston Street, S.E., Apartment 301, Washington, D.C., where Petitioner had been residing with his girlfriend and her children. Petitioner was present at the apartment when the warrant was executed.

Shelley Progovitz, a Charles County evidence technician, who had responded to the victim's residence on July 14, 2006, also accompanied the D.C. officers. In the words of Petitioner's brief:

> Ms. Progovitz collected and bagged a black tee-shirt, a pair of black Nike boots, and two pairs of brown Timberland boots. She also processed a small box collected from the sill in the bedroom that contained items of jewelry. Ms. Progovitz photographed the box at the scene, but its contents were "all like jumb[led] up . . . or on top of each other in the box." Nonetheless, Ms. Progovitz claimed that there was no clasp in the box seized during the search warrant.

> Detective Shankster explained on cross-examination that he was present for the collection of the necklace and pendant during the execution of the search warrant, and that "[w]e left a search warrant return which documents the items we seize from the residence. We leave a copy of the search warrant and search warrant return with the occupants . . ." The Return described the box and its contents that were seized as follows: "Box w/chain w/broken clasp

w/Jesus & Cross". The trial court would not, however, allow the Defense to cross-examine Detective Shankster (or any State's witness) about the contents of the Return. Detective Shankster testified that after execution of the warrant, he returned with [the victim] on July 27, 2006, to [the victim's] apartment to collect the clasp because he "assumed that the [crime scene technician] would have collected it, but she didn't." [The victim] testified that when he returned to the apartment, "the detective [Shankster] was actually right there standing by my side the whole time," however, [the victim] did not see the detective collect any evidence when they returned together to his apartment. [The victim] also testified that he could not remember the detective pointing out anything that the detective located in the apartment.

\*　　\*　　\*

Detective Shankster claimed that he took a picture of the bloodstained area in the bedroom that showed a "clasp" but testified he did not collect it or request that it be collected. He then left to go to the hospital to speak with [the victim]. After Detective Shankster left [the victim's] apartment, the crime scene technician, Ms. Progovitz, arrived. Her specific duties were to photograph the scene, search for evidence, collect evidence, and process any evidence ... Ms. Progovitz photographed [the victim's] apartment and collected items of evidence from it, including a dust particle mask from the bedroom floor near the dresser in the area where Detective Shankster testified the clasp was present.

Neither Ms. Progovitz, nor Corporals McCue or Strafella—who had each been through every room in the apartment—observed any broken items of jewelry or a clasp on the bedroom floor. At trial, Detective Shankster was unable to identify the clasp in the pictures of the bedroom taken on the night of the incident by the crime scene technician, Ms. Progovitz.

It was the theory of Petitioner's case that he was in possession of the victim's necklace because the victim had

given it to him as a gift, and that the clasp had not been removed from the necklace when it was found in Petitioner's apartment. The State, of course, emphasized the evidence that (1) the clasp, which broke off of the victim's necklace when the necklace was ripped off his neck, was recovered from the victim's apartment, and (2) the rest of the victim's necklace was recovered from Petitioner's residence. The State's closing argument included the following assertions:

> The victim identified the chain—yeah that is the chain that was ripped off me—that is the pendant that was on the chain when it was ripped off me, and again it is his blood that is found on that chain.

> That chain that is found in the Defendant's bedroom during the search warrant—what explanation is there ladies and gentlemen as far as how that chain got there? There is only one. It was ripped off the victim by the Defendant on the night of the attack and we have got further evidence to show that because you can see the clasp right there—picture taken by Detective Shankster—July 14, 2006 the night of the attack.

> You see the two sections in the bedroom where the victim was attacked. You see the clasp right there. Now at the time this picture was taken no one had talked to [the victim] yet—no officers that were on that scene had talked to [the victim] yet. They didn't know if that clasp was significant or not. Ms. Progovitz didn't know if that clasp was significant was not.

> When Detective Shankster was with the execution of the search warrant in the District of Columbia—what did he see—he saw that picture—he saw that chain—what is missing on that chain—the clasp. The testimony was from the Detective as well as Ms. Progovitz that they opened that box there was no clasp connected to that chain.

> Why is that? Well we know why that's the case—because it was laying in a pile of—puddle of blood on the victim's floor after the chain was ripped off his neck and he got the clasp. What did [Detective Shankster] do—said, when I see that chain and I notice there is no clasp on that chain, I think to

myself, wait a minute I know where the clasp is. I have seen that clasp before. He goes back to the victim's apartment and he collects State's Exhibit 45—that clasp. This was shown to the victim and he said, yeah, that is my clasp. How does he know that? Because he has been wearing this chain for years. He wears it almost everyday. It is his prized possession. He knows this clasp. So we know when that chain is ripped off the victim's neck. The clasp tells the story, again, showing that the testimony you heard from [the victim] is completely accurate.

During the State's case-in-chief, Petitioner's trial counsel made two attempts to place before the jury what had been marked as Defense Exhibit number 5 for identification, the search warrant "return" prepared by Detective Brett Smith of the D.C. Police Department. The first attempt occurred during Ms. Progovitz's testimony. The record shows that the following transpired during her cross-examination:

Q: I'd like to show you again number 5.

A: Okay.

Q: Okay. Which indicates a search warrant return. This indicates box with chain . . .

[Prosecutor] Your Honor, I am going to object at this point. This is not in evidence.

[Bench conference was held]

[The Court] It's not her document. It's not her document. She didn't sign it did she?

[Prosecutor] No. No one that's going to be in this trial . . .

[Defense Attorney] But . . .

[The Court] So, you can't . . . you can't impeach her with it.

[Defense Attorney] But, she was . . . the reason I think it . . . ask it is that she identified it as the return for this property and I can ask her to say she did.

\* \* \*

[The Court] It looked like it, but she . . . its's not her statement it's not her written statement.

[Defense Counsel] Alright. Alright. But, I think that I can ask her whether that changes the recollection of what she saw or what's there . . .

[The Court] Well, you can use it to refresh her recollection.

[Defense Counsel] Okay.

[The Court] But you can't . . .

[Prosecutor] I would even object to that. To refresh her . . .

[The Court] No, no no, you can use a bowling ball to refresh recollection. It doesn't have to be statement by the same witness.

[Prosecutor] Okay. Well, then I guess I would object . . .

[The Court] You can show it to her . . .

[Prosecutor] Okay.

[The Court] . . . but you can't read it.

[Prosecutor] I would object to her having to read it or any counsel read it.

[The Court] But, she can read it to herself.

[Prosecutor] Certainly. Okay.

[Defense Attorney] Um, hum.

[The Court] But, not orally.

[Defense Attorney] Okay. Okay.

[Re–Cross Resumed]

[Defense Attorney] Showing you exhibit 5 here. My question is you could read that, my question is whether that refreshes your recollection about the condition of the necklace in this case.

\* \* \*

[The Court] Well, wait a second. Do you have any difficulty remembering what it looked like?

[Witness] No.

[The Court] There's nothing to refresh.

[Defense Attorney] Okay. Alright. Thank you. Alright. I have no further questions.

Anticipating that Petitioner's trial counsel would attempt to place the contents of the return before the jury during Detective Shankster's testimony, the State moved *in limine* to "prevent [Petitioner's trial counsel] from question[ing] or attempt[ing] to offer [into evidence the search warrant return] through any witness that [was] not the author of the document." The record shows that the following transpired during the *in limine* hearing:

[Prosecutor] Your Honor, I would ask that with regards to the search warrant return sheet, I would . . . I'd essentially ask, I mean, it's in a way, I guess, it's a motion *in limine,* that [defense] counsel not be allowed to question or attempt to offer that I believe is Defendant's 5 through any witness that is not the author of the document. I would argue that if we're attempting to show that to the jury I think that's attempting to send a signal to the jury with evidence which is not at least at this point admissible evidence.

&ast; &ast; &ast;

[Defense Counsel] That was . . . the return of search warrant is obtained through the discovery process. It is part of . . . in other words, this was something that was . . . the search warrant request to be done by Detective Shankster.

[The Court] Um, hum.

[Defense Counsel] He was the one present at the scene. And, would receive that document at the time that it was executed. So, I think that that's something that he . . . he could be questioned about.

[The Court] Well he didn't fill it out did he?

[Defense Counsel] No. No. He didn't fill it out. It would be . . . it could be . . . he could be questioned about it. And, this, anyway, it says . . . it refers to a broken clasp.

[Prosecutor] Well, it refers to a bracelet with a broken clasp. But, it does not separately refer to a broken clasp. If you read it, it does . . . it is very careful to distinguish separate items. The clasp is not separated. It is described as a box with a bracelet with a broken clasp and a pendant. So, it . . .

[The Court] Well, actually, it says box with chain with broken clasp with Jesus Cross.

[Prosecutor] My first argument is, of course, there could be no possible foundation laid without the author of that document. And, obviously, if we're going to ... if a piece of evidence like that would be admitted, that line would have to be explained as to exactly what that person meant by what he wrote. That person is not here.

[The Court] Well, how are you going to get it into evidence if you're trying to[?]

[Defense Counsel] Through ... it would be through Detective Shankster. He was ...

\* \* \*

[The Court] Well, he's not the author right?

[Defense Counsel] He's not the author, but he's ... he's ... of them team, he's the leader of the team that does ... does that. I mean, you know, I mean certainly the State can ...

[The Court] No, he's not.

\* \* \*

[Defense Counsel] And, he certainly he can be ... come back. He can be shown the chain and say well, to the best of my knowledge that's what it looks like. I just think it should be ... it should be something he can be cross-examined on.

[The Court] No. It's not his document. How can he answer a question well why does it say this? You're asking for an opinion, right?

[Defense Counsel] Well, we're asking for him ... he can explain. He can explain his interaction.

[The Court] How can he ... no, he didn't write it down.

[Prosecutor] He can't.

[The Court] So how can he explain it? I mean, you can use it to refresh recollection ... but at this stage I think you need ... Detective Brett Smith to say why he wrote that down. And for the record, we've been talking about Defendant's Exhibit [5].

As noted above, Petitioner was convicted of robbery and related offenses. In his appeal to the Court of Special Appeals, Petitioner argued (in the words of his brief):

[The] testimony of Detective Shankster at trial unequivocally demonstrated that he ratified and adopted the contents of the Return. As such, Detective Shankster was subject to cross-examination regarding the inconsistency between his testimony and the Return.

Moreover, the Return was independently admissible as an admission since Detective Shankster adopted the statements in the Return in his role as a State agent.

Detective Shankster who was acting in his official capacity as a State agent admitted under oath that the Return documented the item[s] "we found" which would include a broken clasp. As such, Mr. Sweetney should have been allowed at a minimum, to question Detective Shankster regarding the return. Detective Shankster then would have had the opportunity to explain, if he could the inconsistency.

The Court of Special Appeals rejected these arguments, stating:

The "party in question in this case is of course, the State. In effect, [Petitioner] contends that the return was admissible because the return was either signed by an agent of the State with authority to do so or was otherwise adopted by such an agent. Even assuming that Detective Shankster was authorized to fill out and sign the return on a search warrant issued by a court of another jurisdiction, he did not do so.

\* \* \*

[Petitioner] also contends that Detective Shankster effectively ratified and adopted the return and its contents by physically delivering a copy of the document to Ms. Wells. He relies on *Nance v. State*, 331 Md. 549, 567–568[, 629 A.2d 633, 642–43] (1993), as support for this proposition. *Nance* is inapposite. The issue in that case involved whether a witness' pre-trial identification was admissible as a prior inconsistent statement when the witness repudiated the

identification at trial. *Id.* at 564[, 629 A.2d at 640–41]. In the case before us, Detective Shankster did not fill out or sign the return and there is no indication that Smith reviewed the return's contents with Detective Shankster before signing it ... The trial court did not err in declining to admit the return.

*Sweetney v. State,* No. 91, September Term, 2008, slip opinion pp. 19–20.

### Discussion

 Petitioner argues (in the words of his brief):

These [above stated] circumstances suggested that, at the least, the possibility that Detective Shankster, at an earlier point in the investigation, improperly sought to compensate for [the victim's] failure to initially identify [Petitioner] as one of the persons involved in the incident by fabricating a link between the necklace recovered from [Petitioner's residence] and the crime. The purported recovery of the clasp from [the victim's] apartment created that essential link, but Detective Shankster's testimony on this key point was directly contradicted by the description in the Return served by him ... Cross examination about the search warrant return that he personally served was, therefore, of unquestionable significance to the jury's assessment of the weight and credibility of Detective Shankster's testimony.

\* \* \*

[S]alient agency principles apply to this case regardless of whether the underlying issue is directed at the constitutional grounds for suppressing evidence from the search, improper custodial interrogation or whether a search warrant return would constitute an admission of a Maryland agent. [*State v.*] *Mollica,* [114 N.J. 329, 554 A.2d 1315 (1989)], [*State v.*] *Knight,* [145 N.J. 233, 678 A.2d 642 (1996)], and [*State v.*] *Cauley,* [863 S.W.2d 411 (Tenn.1993)], simply stand for the position that where one government entity is acting at the behest and direction of another the acting

government entity is an agent of the requesting government entity.

As such for the purpose of Maryland Rule 5–803(a), Detective Smith of the Metropolitan Police Department was acting as an agent of the State of Maryland where he prepared the Return. The search of [Petitioner's] District of Columbia residence was instituted at the request of the State of Maryland, seeking evidence from a crime which occurred in Maryland, and such evidence was specifically obtained for the purpose of turning that evidence over to Maryland authorities for use in a Maryland prosecution. Thus, there was sufficient "mutual planning joint operations, and mutual assistance" to establish agency. *See State v. Mollica,* 554 A.2d at 1329; *State v. Cauley,* 863 S.W.2d at 415–416. Consequently, this Court should reverse the decision of the Court of Special Appeals.

■ Because it is well settled that the hearsay statement of a police officer cannot be introduced into evidence during the cross-examination of another officer in the very same police department, we hold that there is no merit in Petitioner's "agency" and "ratification" arguments.[1] Petitioner obviously had a constitutional right to secure the presence of Detective Smith and question him about what he had written on the Return. During the cross-examination of Detective Shankster, however, Petitioner was not entitled to establish what Detective Smith had written on the Return.

In *Wiggins v. State,* 90 Md.App. 549, 602 A.2d 212 (1992), while affirming convictions for murder and related offenses, the Court of Special Appeals rejected the argument "that the

---

1. According to the State, Petitioner's "intergovernmental agency" and "adoption by ratification of the search warrant return" arguments have neither been preserved for appellate review nor encompassed within the questions presented in Petitioner's cert. petition. According to Petitioner, these are not "new" arguments, but merely (in the words of Petitioner's reply brief) "provide an additional foundational basis for the cross-examination of Detective Shankster regarding the Return." In light of our holding, it is of no consequence whether Petitioner's "agency" and "ratification" arguments were properly preserved for appellate review.

trial court erred in sustaining the State's objection to appellant's questioning of [Corporal Paul] Noblitt [of the Prince George's County Police Department] regarding whether the police investigation had disclosed appellant's fingerprints on the victim's vehicle." *Id.* at 574, 602 A.2d at 224. The record shows that the following transpired during Corporal Noblitt's cross-examination:

[Defense Counsel]: Did there ever come, in your capacity as lead investigator, a time that you ever received any information that the fingerprints of Bernard Wiggins were found on the Brinkley Road address?

[Prosecutor]: Objection.

[The Court]: That's sustained.

* * *

[Defense Counsel]: Could I ask for the basis?

* * *

[Prosecutor]: Fine. The reasons I am objecting—I am not objecting because it's beyond the scope. I am really objecting—which it is—it's classic hearsay. Just because he is the lead investigator, doesn't mean he can testify to everything that occurred in this case. Only what he has personal knowledge of.

While holding that the Circuit Court ruled correctly when it sustained the State's objection about what Corporal Noblitt's fellow officers had reported to him, the Court of Special Appeals stated:

[I]t is clear to us that the objection was properly sustained, especially when viewed in context with the trial judge's previous rulings when the State objected. The question called for hearsay. Noblitt had earlier testified that he did not personally examine the vehicle. Therefore, he could not have testified from personal knowledge whether examination of the car had disclosed or failed to disclose appellant's fingerprints.

*Id.* at 576, 602 A.2d at 225.

In *Bell v. State,* 114 Md.App. 480, 691 A.2d 233 (1997), the Court of Special Appeals reversed manslaughter and attempted first degree murder convictions on the ground that the trial

court should not have allowed the prosecutor to ask the appellant a series of "would it surprise you that" questions by which the State "succeeded in placing before the jury the written content of" a statement made to investigators by a person who did not testify at trial. *Id.* at 495, 691 A.2d at 240. While rejecting the State's argument that it was entitled to use the out-of-court statement for purposes of impeachment, the *Bell* Court stated:

Statements that are otherwise inadmissible are not salvaged by invoking the mantra of "impeachment." If the State could not properly use the statement under the applicable rules of evidence, we fail to see how it could, instead, read the statement to the jury, apparently line by line, through the questions it posed to the defendant.

Unquestionably, a party may attempt to impeach a witness by challenging his or her credibility.... But impeachment must be consistent with the common law and the rules of evidence.

*Id.* at 496–97, 691 A.2d at 241. (Internal citation omitted).

In *Farewell v. State,* 150 Md.App. 540, 822 A.2d 513 (2003), while holding that (harmless) error occurred when the prosecutor used the written statement of Joseph Tyler, a non-testifying co-defendant, during the cross-examination of Joseph Owens, another codefendant who testified for the defense, the Court of Special Appeals stated:

In this case, the State impermissibly used Tyler's statement under the guise of refreshing Owens' memory. Owens' testimony was offered to prove that appellant was not at the scenes of the crimes on the night in question. Although Tyler's statement was never formally received into evidence, the clear implication to the jury was that Tyler had told the police that Owens had played a role in the robbery of Dominic's Pizza. The State should not have been permitted to use Tyler's statement to introduce otherwise inadmissable evidence.

*Id.* at 579, 822 A.2d at 535.

The holdings in *Wiggins, Bell,* and *Farewell* are entirely consistent with federal cases that hold as follows:

Under the Federal Rules of Evidence, a party may attempt to impeach a witness through evidence of character or conduct, of conviction of a crime, or of prior inconsistent statements. See Fed.R.Evid. 608, 609, 613. "[W]itnesses are not impeached by prior inconsistent statements of other witnesses, but by their own prior inconsistent statements." *United States v. Tarantino,* 846 F.2d 1384, 1416, 269 U.S.App.D.C. 398 (D.C.Cir.1988).

*United States v. Wilson,* 720 F.Supp.2d 51, 66 (D.D.C.2010).

In *United States v. Hall,* 989 F.2d 711 (4th Cir.1993), while reversing conspiracy and distribution of cocaine convictions of a defendant who was cross-examined about statements that his wife had made to government investigators, the United States Court of Appeals for the Fourth Circuit stated:

Protections against the use of privileged and inadmissible evidence would be of little benefit if the prosecutor were allowed, under the guise of "artful cross-examination," to tell the jury the substance of inadmissible evidence. *Gold-smith [v. Witkowski,* 981] F.2d [697] at [704] (reversal required when prosecution presented inadmissible evidence through the "back door"); *United States v. Check,* 582 F.2d 668, 683 (2d Cir.1978) (reversal based on prosecutor's "transparent" introduction of inadmissible hearsay through "artful" cross-examination, "the government received the benefit of having, in effect, an additional witness against [the defendant] while simultaneously insulating [the witness] from cross examination . . .");

\* \* \*

This case presents an egregious example of "artful" cross-examination. [The prosecutor] repeatedly told the jury that he possessed a statement given by the defendant's wife. He then proceeded to read the statement to the jury under the guise of cross-examining Hall. In effect, the government gained extremely damaging inculpatory testimony that could not have been introduced into evidence. The government's use of Mrs. Hall's unauthenticated statement violat-

ed Fed.R.Evid. Rule 802 ("Hearsay is not admissible except as provided by these rules....")[.]

*Id.* at 716–17.

*Hall* was cited with approval by the United States Court of Appeals for the Ninth Circuit in *United States v. Sanchez,* 176 F.3d 1214 (9th Cir.1999). While reversing an "assisting federal offenders to avoid apprehension" conviction on the ground that the prosecutor should not have been permitted to cross-examine the defendant about a hearsay statement made by the defendant's wife to federal marshals, the *Sanchez* Court stated:

It is improper "under the guise of 'artful cross-examination,' to tell the jury the substance of inadmissible evidence." *United States v. Hall,* 989 F.2d 711, 716 (4th Cir.1993); *see also Goldsmith v. Witkowski,* 981 F.2d 697, 704 (4th Cir.1992) (prosecutor may not present inadmissible evidence through the "back door"); *United States v. Check,* 582 F.2d 668, 683 (2d Cir.1978) (prosecutor may not introduce inadmissible hearsay through "artful" cross-examination)[.]

*Id.* at 1222.

Professors Mueller and Kirkpatrick include "narrative ambiguity" as one of the various "risks" that come with hearsay evidence:

[W]e have the risk that the declarant might misspeak or be misunderstood. There are three concerns: One is that he might say one thing but mean another (a slip of the tongue). The second is that even if he uses words well and chooses the best possible ones to convey his intended meaning, he might still be misinterpreted. Experience differs among people, so the images and meanings that words convey to most people might not be the ones that others take from them. The third is that language, while rich in nuance and variety, may not capture the point of detail, or the qualification or limit, that lies at the heart of a litigated dispute.

Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence,* § 8.2 at 789 (4th ed.1995).

It is clear that the Return prepared by Detective Smith is ambiguous. When he wrote, "Box w/chain w/broken clasp w/Jesus & Cross," he might have intended to document the seizure of a box containing (1) a chain to which a broken clasp was *attached at that time and place*, (2) both a chain *and* a broken clasp, or (3) a chain that at one time, but no longer, had a clasp. While Petitioner was entitled to take advantage of the ambiguous language in the Return, Petitioner was required to do so in conformity with the rules of evidence.

Petitioner had a right to introduce the Return into evidence through the testimony of Detective Smith. It is clear from the above cited cases, however, that the Circuit Court neither erred nor abused its discretion when it prohibited Petitioner from cross-examining Detective Shankster about ambiguous language in an out-of-court statement written by Detective Smith.

## II.

While we do have discretion to review "unpreserved" arguments, we decline to undertake a "plain error" review of Petitioner's "prosecutorial misconduct" arguments, which (1) should have been presented to the Circuit Court at a point in time when that Court could consider and respond, and (2) are more appropriately resolved in a post-conviction proceeding.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; PETITIONER TO PAY THE COSTS.**