IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 13, 2020

## STATE OF TENNESSEE v. REGINA JACKSON

**Appeal from the Circuit Court for Cheatham County**
**No. 17198    Suzanne Lockert-Mash, Judge**

_____

### No. M2019-01390-CCA-R3-CD

_____

The defendant, Regina Jackson, appeals her Cheatham County Circuit Court jury conviction of second offense driving under the influence ("DUI"), arguing that the trial court erred by denying her motion to dismiss for lack of probable cause and by denying her a new trial based on newly discovered evidence. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Terrance McNabb, Pleasant View, Tennessee, for appellant, Regina Jackson.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Assistant Attorney General; Ray Crouch, District Attorney General; and Jack Arnold, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Cheatham County Grand Jury charged the defendant with one count of second offense DUI arising from an incident that occurred on September 14, 2013.

At the May 2018 jury trial, former Ashland City Police Officer Joseph Olivas, who was employed by the Tennessee Highway Patrol at the time of trial, testified that he responded to a call on September 14, 2013, of a suspicious woman at a residence on Bell Street who was "possibly intoxicated" and "attempting to give [a] lady money." While en route to the given address, the caller reported that the suspect left the scene in the direction of Highway 49 "in a silver gray Toyota car." Officer Olivas, coming from Highway 49, spotted a vehicle matching the description stopped on the side of the road in front of a gated entrance to St. Martha's Catholic Church.

Officer Olivas said that he stopped his patrol car "a little past the driveway" where the defendant's vehicle was stopped and approached the defendant. The defendant told him that she was "coming from work, and she had to swing by a family member's house to give some money to a family member or a child or something of that nature." He asked the defendant for her license, vehicle registration, and insurance information. While the defendant was retrieving her documents, Officer Olivas noticed that she was "fumbling through her paperwork, trying to get her information, and wasn't able . . . to find her information as a normal person would at that time." He also noticed that the defendant had "slurred speech" and "bloodshot eyes." He asked the defendant to exit her vehicle so he could administer field sobriety tests. Because the recording equipment on his patrol car was inoperable at the time, Officer Olivas had another officer come to the scene, and he used that officer's video recording equipment to film the defendant's performance on the field sobriety tests. He acknowledged, however, that he failed to capture any audio recording of the encounter.

Officer Olivas testified that he was specifically trained in field sobriety testing, DUI detection, Advanced Roadside Impaired Driving Enforcement, and the Drug Recognition Expert Program. His training equipped him to "determine whether somebody is under the influence of alcohol and/or drugs, or just drugs, or a combination of both." He stated that he had developed "a set spiel" when administering field sobriety tests, giving the "exact same" instructions "in the same tone" and "in the same manner" each time.

Officer Olivas stated that he administered three field sobriety tests to the defendant: the horizontal gaze nystagmus test, the walk-and-turn test, and the one-leg stand test. Before beginning the tests, Officer Olivas checked the defendant for head trauma or brain injury by looking at her pupil sizes. He also asked her if she had any difficulty with her "knees, back, legs or anything like that" that would inhibit her ability to perform the tests, and the defendant indicated that she did not.

During the horizontal gaze nystagmus test, Officer Olivas had the defendant concentrate on the tip of a pen that he held at various points in her horizontal and vertical line of vision to check her nystagmus, which he described as an "involuntary jerking of the eyes." He also checked for a "[l]ack of smooth pursuit" of the defendant's eyes and whether her eyes "move[d] freely and equally." Officer Olivas stated that he "observed all six clues" indicating impairment in the defendant's performance.

Next, Officer Olivas administered the walk-and-turn test in which he instructed the defendant to walk on a straight white line, placing one foot in front of the other for nine steps, turning, and taking nine steps back. He said that while he was instructing the defendant on how to perform the test, the defendant was "argumentative"

and "uncooperative," and "there was a lot of bickering back and forth between me and her." He explained that the defendant was unable to complete the walk-and-turn test; "She cannot maintain her ability to walk a straight line, uses her arms for balance, steps off line, misses heel-to-toe, improper number of steps taken." Officer Olivas said that the defendant also could not perform the one-leg stand test in which he instructed her to hold one foot six inches off of the ground for 30 seconds with her leg straight and her toes pointed out. He said that the defendant could not "keep her balance and she almost fell three or more times," at which point he stopped the test for the defendant's safety.

Officer Olivas said that he asked the defendant for her consent to a blood test, but she refused, even after he explained that she could lose her driver's license for one year for her refusal to consent. Based on the defendant's poor performance on the field sobriety tests, Officer Olivas determined that she was "under the influence of an alcoholic beverage and/or medication and she was unable to operate a motor vehicle safely." He also said that he smelled alcohol on the defendant. The defendant admitted to Officer Olivas that she had taken her Xanax and Zoloft earlier that day, despite having first denied taking any substances or consuming alcohol.

During cross-examination, Officer Olivas stated that he activated his blue emergency lights when he arrived at the scene for "scene safety." He said that the defendant was not detained until "the investigation was complete, and after I brought her back to my patrol car and read her the implied consent," before which she was free to leave.

Officer Olivas acknowledged that some people have "natural nystagmus," which may be caused by brain tumors, certain medications, flashing lights, vertigo, or inner vestibular problems and that he was not qualified to exclude these other causes. He reiterated, however, that based on his training and experience, he concluded that the defendant was under the influence of alcohol or other substances. He acknowledged that the sun was in the defendant's eyes while she performed the field sobriety tests, but Officer Olivas explained that he had the defendant stand with her back to the flashing blue lights of his patrol car so that the flashing lights would not interfere with the nystagmus test. He stated that, to his knowledge, sunlight did not have the same effect on a person's nystagmus as flashing lights.

Officer Olivas admitted that he did not observe the defendant driving and that he approached her based solely on the information he received from his dispatcher. He stated that he did not know who reported the defendant's behavior, whether that person had observed the defendant, where the caller was located at the time, or when they were alleged to have seen the defendant. He stated that he did not attempt to have the caller identify the defendant because he did not need that information to effectuate an arrest. After the defendant's arrest, Officer Olivas inventoried her vehicle and recovered a walker,

which Officer Olivas said the defendant had indicated belonged to her husband. He reiterated that he asked the defendant whether she required assistance walking before he administered the field sobriety tests.

On redirect examination, Officer Olivas stated that it was possible for a person to pass the field sobriety tests. He explained that the tests were designed as "divided attention tests," which required the examinee to talk and move simultaneously, noting that, in order to safely operate a motor vehicle, a driver must be able to maintain divided attention to watch, look, listen, and control the vehicle at the same time.

The State rested, and after a *Momom* colloquy, the defendant elected to not put on proof.

The jury found the defendant guilty of DUI, and the parties stipulated that the defendant had previously been convicted of a DUI, making this a second offense DUI conviction.

After a sentencing hearing, the trial court sentenced the defendant to 11 months and 29 days to be served as probation following 45 days' confinement. The court imposed a $600 fine. The court allowed the defendant time to find an inpatient rehabilitation program where, if admitted, she could gain up to 20 days' credit toward her sentence.

Following a timely but unsuccessful motion for a new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant argues that the trial court erred by denying her motion to dismiss the charge on the ground that Officer Olivas lacked probable cause or reasonable suspicion to stop the defendant. She also asserts that the trial court erred by denying her motion for new trial on the ground of newly discovered evidence in the form of medical records of her diagnosed mental health issues.

## I. Motion to Dismiss

The defendant first contends that the trial court erred by denying her motion to dismiss, arguing that Officer Olivas lacked reasonable suspicion to detain her because the information from the anonymous caller was unreliable. The State argues first that the defendant was not seized until Officer Olivas "had detected all the hallmarks of intoxication."[1] Alternatively, the State argues that Officer Olivas had reasonable suspicion to perform an investigatory stop.

---

[1] This particular claim is not advanced by the state at the suppression hearing. As such, we are not privileged to consider it when it is raised for the first time on appeal. *Cauthern v. State*, 145 S.W.3d 591, 599 (Tenn. Crim. App. 2004).

At the October 2015 motion hearing, Officer Olivas testified, much as he did at trial, that he received a call about a potentially-intoxicated female in a silver Toyota at a residence on Bell Street. "Within minutes" and approximately one-half mile away from the Bell Street address, he spotted the defendant's vehicle on the side of the road in front of a locked gate at St. Martha's Catholic Church. Officer Olivas stated that locating the described vehicle within a few minutes and only a short distance from the reported location corroborated the report. He began an investigation, and, while talking with the defendant, he "observed the bloodshot eyes, slurred speech," and the defendant's fumbling for her identification and vehicle registration. He asked the defendant to exit the vehicle, at which time he smelled alcohol on her breath. Officer Olivas stated that the defendant "did poorly" on all three field sobriety tests and that, based on his training as a drug recognition expert, he determined that the defendant "was clearly under the influence of something and was not able to drive a motor vehicle safely."

During cross-examination, Officer Olivas acknowledged that he did not see the defendant driving, but rather, he found her sitting in the parked vehicle. He also acknowledged that he had received no report of the defendant's driving dangerously. Officer Olivas stated that a person could perform poorly on field sobriety tests for a variety of reasons. He said that although the caller did not report any details as to why she believed the defendant to be "possibly intoxicated," it was his practice to respond to such calls to check on the person's welfare. He explained that he did not go to the Bell Street address because he encountered the defendant while en route.

On redirect examination, Officer Olivas stated that, according to the CAD dispatch report, which was exhibited to the hearing, the caller indicated that the "possibly intoxicated" female left the Bell Street residence at 11:37 a.m., and Officer Olivas made contact with the defendant at 11:38 a.m.

Upon questioning by the court, Officer Olivas stated that the defendant's vehicle was stopped, facing the locked gate at the church's entrance. He said that he pulled his vehicle onto the shoulder of the road and not directly behind the defendant's vehicle, and that the defendant had room to pull her vehicle out of the driveway and leave the scene. Officer Olivas said that he activated his emergency blue lights because he was "in oncoming traffic."

In its written order denying the defendant's motion to dismiss, the trial court concluded that Officer Olivas had reasonable suspicion to stop and investigate the defendant, finding that he had received a "specific description of the intoxicated driver and the vehicle she was driving," that he located the defendant's vehicle one-half mile from where she had reportedly left minutes prior, and that the defendant appeared

-5-

intoxicated upon his arrival.

Although styled as a motion to dismiss, the proper remedy for an illegal search or seizure is suppression of the evidence obtained from the illegal conduct. *See* Tenn. R. Crim. P. 41(g) ("A person aggrieved by an unlawful or invalid search or seizure may move the court pursuant to Rule 12(b) to suppress any evidence obtained in the unlawful search or seizure."); *State v. Garcia*, 123 S.W.3d 335, 343 (Tenn. 2003) (stating that "a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression" (quoting *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997))). Consequently, the defendant's motion should be construed as a motion to suppress, and we will consider it as such.

When reviewing a trial court's findings of fact and conclusions of law on a motion to suppress evidence, we are guided by the standard of review set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. As in all cases on appeal, "[t]he prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). We review the trial court's conclusions of law under a de novo standard without according any presumption of correctness to those conclusions. *See, e.g.*, *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999).

The authority of a police officer to stop a citizen's vehicle is circumscribed by constitutional constraints. Police officers are constitutionally permitted to conduct a brief investigatory stop supported by specific and articulable facts leading to a reasonable suspicion that a criminal offense has been or is about to be committed. *Terry v. Ohio*, 392 U.S. 1, 20-23 (1968); *State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). Whether reasonable suspicion existed in a particular case is a fact-intensive, but objective analysis. *State v. Garcia*, 123 S.W.3d 335, 344 (Tenn. 2003). The likelihood of criminal activity required for reasonable suspicion is not as great as that required for probable cause and is "considerably less" than would be needed to satisfy a preponderance of the evidence standard. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

Furthermore, a court must consider the totality of the circumstances in evaluating whether a police officer's reasonable suspicion is supported by specific and articulable facts. *State v. Hord*, 106 S.W.3d 68, 71 (Tenn. Crim. App. 2002). The totality of the circumstances embraces considerations of the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts on which the law enforcement officer relied in light of his experience. *See State v. Pulley*, 863 S.W.2d 29, 34 (Tenn.

1993). The objective facts on which an officer relies may include his or her own observations, information obtained from other officers or agencies, offenders' patterns of operation, and information from informants. *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992).

As this court has previously stated, "[O]ur supreme court has distinguished between information provided by a known citizen informant and that obtained from a criminal or professional informant." *State v. Luke*, 995 S.W.2d 630, 636 (Tenn. Crim. App. 1998) (citing *State v. Cauley*, 863 S.W.2d 411, 417 (Tenn. 1993); *State v. Melson*, 638 S.W.2d 342, 354 (Tenn. 1982)). Information provided by known citizen informants "is presumed to be reliable" because they "have necessarily gained their information through first-hand experience" and have provided the information "in the interest of society or personal safety." *Id.* (citing *Cauley*, 863 S.W.2d at 417; *Melson*, 638 S.W.2d 354-56). To benefit from the presumption of reliability, the named citizen informant's "status or . . . relationship to the events or persons involved must be present." *Id.* at 637. Additionally, unlike the anonymous informant, a named citizen informant's credibility is bolstered because "the officer has the ability to contact the citizen informant in the event of a false report." *Id*.

The defendant contends that Officer Olivas lacked reasonable suspicion of criminal activity because the informant was an anonymous caller whose report was incredible and unreliable, arguing that the caller did not indicate how she came by the information or provide any details as to why she believed the defendant to be potentially intoxicated. The record, however, supports the trial court's ruling that Officer Olivas had reasonable suspicion to perform an investigatory stop.

As reflected in the CAD dispatch report exhibited to the motion hearing, the informant, Jane Covington, provided her name, telephone number, and address to a dispatcher and stated that a woman was at Ms. Covington's house talking to herself, attempting to give Ms. Covington money, and possibly "drunk." Ms. Covington was, therefore, a known citizen informant, and the reliability of her report is presumed. *See Luke*, 995 S.W.2d at 636. Ms. Covington called back at 11:37 a.m. and reported that the defendant had left the Bell Street address driving a silver Toyota. It was not necessary for Ms. Covington to provide this information directly to Officer Olivas because "[a]n officer may make an investigatory stop based upon a police dispatch as long as the individual or agency placing the dispatch has the requisite reasonable suspicion supported by specific and articulable facts that indicate criminal conduct." *Id.* at 636 (citing *State v. Moore*, 775 S.W.2d 372, 378 (Tenn. Crim. App. 1989); *Whiteley v. Warden*, 401 U.S. 560, 568 (1971)). Furthermore, although Ms. Covington did not describe the defendant's acting in a manner that was necessarily criminal, she articulated a reason for her belief that the defendant was potentially intoxicated—the defendant's talking to herself and attempting

to give Ms. Covington money—and stated that the defendant had driven away. The information Ms. Covington provided, even if not recited to Officer Olivas in its entirety, was sufficient to give rise to the presumption of her reliability as a citizen informant. *See Luke*, 995 S.W.2d at 636.

Having determined that Ms. Covington was a sufficiently-reliable informant, we turn to whether the circumstances gave rise to reasonable suspicion justifying an investigatory stop. Here, Officer Olivas received a call from a dispatcher of a suspicious woman at a residence on Bell Street who was "possibly intoxicated" and "attempting to give [a] lady money." While on his way to the Bell Street location, the dispatcher notified Officer Olivas that the suspect had left the scene driving toward Highway 49 "in a silver gray Toyota car." Just one minute after that call, Officer Olivas located the defendant's silver Toyota stopped in front of a locked gate one half mile from the Bell Street address. He pulled his patrol car onto the shoulder of the road near the defendant's vehicle and activated his emergency blue lights. He then approached the defendant's vehicle and, upon speaking with the defendant, observed her bloodshot eyes, slurred speech, and difficulty retrieving her identification and registration documents. Officer Olivas asked the defendant to exit her vehicle, at which time he smelled alcohol on her breath. He administered three field sobriety tests, and the defendant performed poorly on each of them. Officer Olivas then arrested the defendant for driving under the influence.

In the totality of the circumstances, Officer Olivas had reasonable suspicion to believe that the defendant had driven under the influence. When Officer Olivas first encountered the defendant and pulled his patrol car to the side of the road, he knew that a potentially intoxicated woman who had been acting in a concerning manner had driven away from a nearby Bell Street residence in a silver Toyota. Officer Olivas' finding the defendant in a silver Toyota in front of a locked gate a short time later gave rise to the reasonable inference that the defendant had driven while potentially intoxicated, and Officer Olivas was justified in conducting an investigatory stop at the time he saw the defendant's vehicle. Consequently, the trial court did not err by denying the defendant's motion to suppress the evidence obtained from that stop.

## II. *Newly Discovered Evidence*

Next, the defendant argues that the trial court erred by denying her motion for new trial on the ground of newly-discovered evidence of the defendant's mental health conditions, which conditions allegedly rendered her "unsteady on her feet during the [f]ield [s]obriety tests" and potentially incompetent to stand trial. The State argues that the trial court did not err.

Before a trial court may grant a new trial on the basis of newly discovered evidence, "it must find that the subsequently or newly discovered evidence 'may have resulted in a different judgment, had it been presented at the trial.' This rule presupposes that such evidence would be admissible." *Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012) *overruled on other grounds by Nunley v. State*, 552 S.W.3d 800 (Tenn. 2018) (citations omitted). Moreover,

> [a]n accused seeking a new trial on the ground of newly discovered evidence must file an affidavit setting forth facts showing that he and his counsel exercised reasonable diligence and were not negligent in the search for evidence in preparation for the trial of the case, that he and his counsel had no pre-trial knowledge of the alleged newly discovered evidence, and it must be supported by the affidavit of the new witness showing the materiality of the testimony and that it had not been communicated to the accused prior to trial.

*Jones v. State*, 452 S.W.2d 365, 367 (Tenn. Crim. App. 1970). Our supreme court observed that "whether the testimony qualifies as impeachment evidence may be relevant in the determination but is not controlling," and it concluded that because "[i]mpeachment evidence might be particularly compelling under the circumstances of a particular case," the "ultimate question" was not whether the purpose of the evidence was impeachment but rather the "effect of the newly discovered evidence on the outcome" of the trial. *State v. Vasques*, 221 S.W.3d 514, 528 (Tenn. 2007).

Here, the defendant presented no affidavit conforming to the requirements specified in *Jones*. Instead, she relied solely on the evidence presented at her sentencing hearing. Indeed, the alleged newly-discovered evidence is, in fact, the defendant's own medical records. Although some of the medical records exhibited to the sentencing hearing reveal certain mental health conditions and diagnoses prior to the offense in this case, the defendant has failed to offer any proof that she and her counsel "had no pre-trial knowledge" of these medical records or had "exercised reasonable diligence" in their search for such evidence. Consequently, this issue lacks merit.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE